FILED

11/19/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0565

DA 21-0565

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 271

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

DAVID STANLEY,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DC-20-394B
Honorable Rienne H. McElyea, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Tammy Hinderman, Appellate Defender, Deborah S. Smith, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Tammy K Plubell, Assistant
Attorney General, Helena, Montana

          Audrey Cromwell, Gallatin County Attorney, Erin Murphy, Deputy County
Attorney, Bozeman, Montana

Submitted on Briefs:  July 12, 2023

Decided:  November 19, 2024

Filed:

_____
Clerk

Justice Dirk Sandefur delivered the Opinion of the Court.

¶1 David Stanley (Stanley) appeals his September 2021 judgment of conviction in the Montana Eighteenth Judicial District Court, Gallatin County, on the offense of felony criminal possession of dangerous drugs (methamphetamine). Stanley asserts that the District Court erroneously denied his motion to suppress drug evidence seized during a post-arrest jail intake search. We address the following restated issue:

*Whether the District Court erroneously concluded that police lacked the requisite particularized suspicion to justify the investigative stop and inquiry that resulted in Stanley's arrest and resulting discovery of drug evidence on jail intake?*

## PROCEDURAL AND FACTUAL BACKGROUND

¶2 Around 2:30 p.m. on September 11, 2020, a Bozeman Police Officer (Jacob Ahmann) was on patrol in a marked patrol car in the vicinity of Baxter Lane and North 11th Avenue in Bozeman, Montana. He had five years' experience as a patrol officer, and related specialized experience as a field training officer. Except as otherwise noted, the following is a summary of pertinent facts not subject to genuine material dispute on the subsequent suppression hearing record comprised of Ahmann's testimony and police patrol car dash camera video excerpts.[1]

¶3 In September 2020, a local man known to Bozeman police patrol officers (Daniel Sobrepena) was the subject of a pending criminal arrest warrant. On September 11, 2020,

---

[1] Also present in the record, but not admitted into evidence at the suppression hearing, are Officer Ahmann's post-incident probable cause affidavit, and the subsequent State affidavit in support of its motion for leave to file a district court charging Information. Without objection from Stanley at the suppression hearing, the prosecutor and District Court occasionally referenced more detailed questions or statements attributed to Ahmann and Stanley.

police received an anonymous tip that Sobrepena had been recently seen and staying in an undeveloped open area in the vicinity of North 11th Avenue, south of the curved Baxter Lane, west of North 7th Avenue, and north of Oak Street in Bozeman.

¶4    In response to the tip, two Bozeman police officers (Peterson and Garfield) were dispatched into the area to search for and apprehend Sobrepena. Based on the tip, dispatch advised that Sobrepena was wearing a red curly wig to conceal his identity from police and avoid arrest on an outstanding warrant. Sobrepena was generally known to police, particularly to Officer Ahmann who had personally interacted with him several times in the past. Already nearby, Ahmann joined the search by proceeding south from Baxter Lane into the undeveloped open area along North 11th Avenue toward its intersection with the east terminus of Patrick Street.[2]  As he turned west off North 11th onto Patrick Street, Officer Ahmann saw a lone man walking a bicycle eastward on the sidewalk along Patrick Street toward North 11th Avenue. The man matched the tipster's description of the fugitive Sobrepena insofar that he was an adult male wearing a distinctive bright red curly wig in that particular area. At hearing, Ahmann described the wig as "very distinct" because it

---

[2]  As described by Ahmann at hearing, and shown in the accompanying demonstrative Google map exhibit referenced at hearing, North 11th Avenue and Patrick Street are paved Bozeman "side street[s]" which intersect in the approximate center of an undeveloped pocket of open land bounded by commercial properties along Baxter Lane to the north, North 7th Avenue to the east, Oak Street to the south, and the North 19th Avenue arterial to the west. Running north to south between Baxter Lane and Oak Street, North 11th Avenue roughly bisects the undeveloped open area. Running west to east from the developed commercial area along the North 19th Avenue arterial into the center of the undeveloped open area, Patrick Street terminates at its T-intersection with North 11th Avenue. Ahmann described the open undeveloped area where Sobrepena was reportedly staying as a "drainage area" where temporary "camps" are often set up "in the brush" in the drainage.

resembled the uncommon hairstyle worn by "the comedian" known as "Carrot Top"—"bright red and curly, longer hair[,] [d]efinitely not the most common hairstyle or hair color."

¶5 Ahmann testified that as he continued down Patrick Street and drove by, the man distinctly looked away to avoid eye-contact with him. Without activating his patrol car top lights or siren, Ahmann immediately pulled over and parked along the curb, several car lengths behind on the opposite side of Patrick Street as the man continued toward the T-intersection with North 11th Avenue.

¶6 While Ahmann was still in his patrol car notifying dispatch of his intent to get out and approach the man on foot, one of the other officers searching in the area for Sobrepena (Peterson) was approximately a block away, heading north on North 11th between Patrick Street and Baxter Lane. On hearing Ahmann's radio call, Peterson immediately turned his marked patrol car around and headed back toward the Patrick Street intersection to assist Officer Ahmann with the suspect. On activation after he turned around, Peterson's dash cam video picked up the man standing alone on the corner sidewalk at the T-intersection, apparently talking on a cell phone. Officer Ahmann's parked patrol car was visible on the other side of Patrick Street a few car lengths behind. After radioing dispatch, Officer Ahmann got out, loudly called out "Daniel!," and then proceeded across the street to approach. When the man responsively turned toward him, Ahmann immediately realized that he was not Sobrepena, but continued forward to speak with him. As Ahmann continued toward the intersection, dash cam video shows Officer Peterson's patrol car enter the T-intersection, and then head straight at the man on the corner, before stopping in the

4

intersection at a 45-degree angle to the curb just as Officer Ahmann had caught-up and began speaking with him. Upon stopping his patrol car nose-in to the curb, Peterson exited and walked up and stood on the other side of the man opposite from Ahmann, thereby effectively surrounding the suspect at close quarters.[3]

¶7    Despite realizing that he was not Sobrepena, Ahmann later explained that he still wanted to question the man about the fugitive Sobrepena because he was wearing the distinctive curly red wig similar to what Sobrepena had reportedly been wearing in that same area to avoid apprehension by police on an outstanding warrant. Ahmann elaborated that he wanted to find out where the man got the wig, whether he personally got it from Sobrepena, and where Sobrepena could then be found for arrest. Though he could not recall the man's name, Ahmann recognized him from various prior patrol interactions including, *inter alia*, a December 2015 encounter when he "actually cited him for assault." In his post-incident probable cause affidavit, Ahmann further elaborated that he also "knew" the man "to be an acquaintance of Sobrepena." He explained at hearing that he thus wanted to question him about where he got the wig, and if he "personally" got it from Sobrepena, "so we could . . . find and apprehend" him.

---

[3] At that point, the police dash cam video showed the man standing at the back corner of the sidewalk with his back to the field, Officer Peterson facing him a few feet away to the man's right, the nose of Peterson's patrol car directly facing him at a 45-degree angle at the corner curb, and Officer Ahmann facing him a few feet away to the man's left. The dash cam video time-stamp indicates that approximately 16 seconds elapsed between the time that Officer Peterson angled-in to the curb, and the time he walked up within a few feet of the man and Officer Ahmann after exiting his patrol car.

¶8    Officer Ahmann testified that he accordingly asked where the man got the distinctive red curly wig.  At the subsequent hearing, Ahmann was not asked, and did not say, how the man responded to that initial question, if at all.  In his post-incident probable cause affidavit, Ahmann testified that the man replied that he "found" the wig "behind Smith's grocery store in a dumpster."[4]  Ahmann testified in his prior affidavit that he also asked when the man "had last seen Sobrepena," to which he replied, not for "years."  Ahmann then asked whether the man had any form of identification.  As clearly audible in the police dash cam video, the following colloquy ensued:

Stanley:   What reason do you guys have to stop me?

Officer:   Now you're a witness.

Stanley:   No, I'm not.

Officer:   Yeh, you're wearing Danny's wig.

Stanley:   This isn't his.

Officer:   Well, that's what the report was, that Danny was wearing a red curly wig.  I just want to know who I'm talking to.

Stanley:   Huh?[5]

Officer:   I just want to know who I'm talking to.

Stanley:   James.

---

[4] In response to a court question at the suppression hearing, defense counsel similarly stated that "Stanley indicated" the wig "was from a dumpster."

[5] The police video manifests that Stanley was still holding a cell phone to his ear, as he had been before Ahmann approached.  The video shows Stanley later look down, apparently terminate the call, and then slip the cell phone into his pocket.

Officer:   James what?

Stanley:   Biden.

Officer:   Biden?

Stanley:   Yeh.

Officer:   I recognize you from a traffic stop and your name's definitely not James Biden. I need you to be honest with me right now.

Stanley:   [Inaudible.]

Officer:   That might be but I definitely recognize you from a traffic stop before. Take your wig off.

Stanley:   [No response.]

Officer:   Take your wig off.

Stanley:   Why?

Officer:   Because I'm going to ID you. You're lying to me right now.

Stanley:   You guys have no reason to be stopping me.

Officer:   Sure. You're wearing the guy's—I stopped you because you're wearing the wig of a guy that we're looking for that's wanted.

Stanley:   [Inaudible.]

Officer:   What's your name?

Stanley:   [No response.]

Officer:   Dude, you're either—either you're lying to me because you have a warrant for your arrest or you're on probation.

Stanley:   I'm not lying.

Officer:   Your name's not James Biden, I damn sure know that. Pull out your phone; you're on Facebook I guarantee it. What's your name? Find it in your phone.

Stanley:   I don't have Facebook.

Officer:   Okay. You have no means to identify yourself?

Stanley:   [No response.]

Officer:   Name and date of birth, man.

Stanley:   [Inaudible.]

Officer:   Name and date of birth.

Stanley:   [Inaudible.]

Officer:   Name and date of birth.

Stanley:   [No response.][6]

Getting no response to his repeated requests for identification, Officer Ahmann reached down and grabbed onto the man's bicycle, at which point he removed the red wig as earlier requested. Still holding onto the bike, the officer again asked for the man's name. He then answered, "David Stanley." Officer Ahmann radioed police dispatch and requested a "local" wants, warrants, and law enforcement "alerts" check on the name "David Stanley." Meanwhile, Officer Peterson explained to Stanley that:

> We're trying to be cordial with you, okay. So, you match the description of somebody who was called in having a warrant. That's why we're stopping you. And now you're giving us a hard time and we don't know you from Adam, and that makes us nervous. If you could just level with us and tell us who you are then you could just go on your way.

---

[6] Stanley's asserted dash cam recording transcription is somewhat more detailed in various regards, but his Opening Brief similarly notes that those response were, to the extent marginally audible, difficult to discern.

¶9 Police dispatch notified Officer Ahmann that the local wants/warrants/alerts check on Stanley came back negative in the Bozeman police database. Officer Ahmann later testified that, in the meantime, Officer Peterson had returned to his patrol car for verification upon recalling that he may have earlier seen Stanley's name on a recent Montana Department of Corrections (DOC) Probation and Parole bulletin. Officer Peterson soon returned and advised that his status checks revealed that Stanley was the subject of a pending DOC Probation and Parole want,[7] as well as separate arrest warrants out of the City of Billings and Yellowstone County. The officers then accordingly placed Stanley under formal arrest,[8] and transported him to the Gallatin County Detention Center. As indicated by dash cam video time-stamp, and characterized by Stanley on appeal, "barely six minutes" had elapsed between the time that Officer Ahmann first engaged Stanley and the time of his formal arrest. A routine inventory search upon jail intake at the detention center subsequently led to police discovery of two small baggies containing a white crystalline substance in Stanley's pocket. The substance later tested positive for methamphetamine.

¶10 In September 2020, the State charged Stanley by Information with felony criminal possession of dangerous drugs. In December 2020, after earlier pleading not-guilty, Stanley moved for suppression of the subject illegal drug evidence as the tainted fruit of an

---

[7] *See* § 46-23-1012, MCA (2019) (warrantless administrative arrests, and judicial arrest warrants, on probation violation).

[8] By that time the third Bozeman police officer involved in the search for Sobrepena (Garfield) was also present after arriving less than a minute earlier.

unlawful warrantless investigative stop without particularized suspicion of criminal activity. The motion alternatively asserted that, even if the initial stop was lawful, Officer Ahmann unreasonably prolonged and expanded the scope of the stop beyond its initial lawful purpose.

¶11 In opposition, the State asserted that the initial encounter between Officer Ahmann and Stanley was, in its entirety, a "voluntary" police-citizen encounter that did not implicate Stanley's federal and state constitutional rights against unreasonable searches and seizures. Backpedaling at the suppression hearing, the State acknowledged that the initially voluntary interaction may have eventually evolved and ripened into a constitutional seizure of Stanley, but not until after he illegally gave a knowingly false name and Officer Ahmann demanded that he remove his wig, or even later when Ahmann grabbed onto his bicycle. Backpedaling further, the State asserted that, even if the initial police interaction with Stanley at the intersection corner effected a seizure, the initial stop was justified on particularized suspicion that he was the wanted fugitive Sobrepena. Avoiding the obvious question as to the validity of the balance of the stop that eventually led to police discovery of Stanley's own wanted status and arrest, the State again switched analytical horses to assert that the "attenuation doctrine" exception to the prophylactic jurisprudential exclusionary rule—the "fruit of the poisonous tree" doctrine—precluded suppression of the resulting drug evidence in any event.

¶12 The District Court ultimately denied Stanley's suppression motion. As a threshold matter as to whether and when a police "seizure" of Stanley occurred as referenced in the Fourth Amendment and Mont. Const. art. II, § 11, the District Court found the facts at issue

10

more analogous to those in *State v. Strom*, 2014 MT 234, ¶¶ 4-5, 10, 13, and 16-17, 376 Mont. 277, 333 P.3d 218 (police seized occupants of generally "suspicious" vehicle legally parked in public park at 9:40 a.m. when uniformed police/marked patrol car approached, officer demanded ID/license from driver and ID from passenger, and directed them to stay put while officer returned to patrol car with their IDs—recognizing and applying Fourth Amendment "seizure" test recognized in *United States v. Mendenhall*, 446 U.S. 544, 551-56, 11 S. Ct. 1870, 1875-78 (1980)), than those in *State v. Wilkins*, 2009 MT 99, ¶¶ 2-3, 12, and 14-15, 350 Mont. 96, 203 P.3d 795 (no seizure of driver of generally "suspicious" running vehicle parked on side street in Billings outskirts at 1:30 a.m. when uniformed officer in marked patrol car merely stopped without top lights/siren to investigate without use of "physical force" and merely questioned "why she was parked on a dark remote street late at night in cold weather"). In essence, the District Court thus implicitly found and concluded that a police seizure of Stanley occurred at the intersection corner because a reasonable person would not have felt free to leave in the face of the conduct and show of force made by Officers Ahmann and Peterson under the totality of the circumstances.

¶13 The District Court took no issue with Officer Ahmann calling-out and walking toward Stanley for the purpose of investigating whether he was the wanted fugitive Sobrepena. But it then agreed with Stanley that, upon seeing that he was not Sobrepena, the police unlawfully proceeded to detain and seize him for questioning without particularized suspicion that he was then engaged in any criminal activity. Ultimately agreeing with the State, however, the Court ruled that the so-called "attenuation doctrine"

11

exception to the jurisprudential "fruit of the poisonous tree doctrine" did not require suppression of the resulting illegal drug evidence. Citing *State v. New*, 276 Mont. 529, 535-36, 917 P.2d 919, 922-23 (1996), and *Utah v. Strieff*, 579 U.S. 232, 136 S. Ct. 2056 (2016), the District Court reasoned that the violation of Stanley's federal and state constitutional right to be free from unreasonable police seizures was not "flagran[t]"; the time between the initial stop and arrest was only a matter of minutes; and the causal link between the unlawful stop and questioning, and the resulting post-arrest discovery of the subject drug evidence, was severed by Stanley's illegal provision of a false name in response to Officer Ahmann's post-seizure request.

¶14 Stanley subsequently pled guilty under a plea agreement which in pertinent part reserved his right to appeal the denial of his suppression motion. In accordance with the joint plea agreement sentencing recommendation, the District Court imposed a two-year suspended sentence and related fines, fees, and probation conditions. Stanley timely appeals.

**STANDARD OF REVIEW**

¶15 The standard of review of a lower court denial of a motion to suppress evidence in a criminal case is whether the court's pertinent findings of fact are clearly erroneous and whether it correctly interpreted and applied the applicable law to those facts. *State v. Hoover*, 2017 MT 236, ¶ 12, 388 Mont. 533, 402 P.3d 1224. Lower court findings of fact are clearly erroneous if not supported by substantial evidence, the court misapprehended the effect of the evidence, or, upon our independent record review, we are firmly convinced that the court was otherwise mistaken. *Hoover*, ¶ 12. Whether a lower court correctly

interpreted and applied the pertinent law to the facts at issue is a question of law subject to de novo review. *Hoover*, ¶ 12.

## DISCUSSION

¶16    *Whether the District Court erroneously concluded that police lacked the requisite particularized suspicion to justify the investigative stop and inquiry that resulted in Stanley's arrest and resulting discovery of drug evidence on jail intake?*

¶17    The Fourth Amendment to the United States Constitution, and Montana Constitution Article II, Section 11, similarly guarantee people the right to be free from "unreasonable searches and seizures" of their "persons, houses, papers, and effects." U.S. Const. amend. IV;[9] Mont. Const. art. II, § 11. In regard to liberty of movement, as in other contexts where implicated, the fundamental purpose of the Fourth Amendment, and Mont. Const. art. II, § 11, is to "protect the privacy and security" of people from "unreasonable government intrusion or interference." *Hoover*, ¶ 14 (citation omitted); *United States v. Martinez-Fuerte*, 428 U.S. 543, 554, 96 S. Ct. 3074, 3081 (1976); *Terry v. Ohio*, 392 U.S. 1, 9, 88 S. Ct. 1868, 1873 (1968) (citing *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 511 (1967) (Fourth Amendment protects people not just places)).[10] Thus, as pertinent here, "[n]o right is . . . more sacred" or "more carefully guarded . . . than the right of every individual to the possession and control of" his or her "person[] free from

---

[9] The Fourth Amendment applies to the States through the Fourteenth Amendment Due Process Clause. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 1691 (1961).

[10] *Accord State v. Bailey*, 2021 MT 157, ¶ 20, 404 Mont. 384, 489 P.3d 889 (citing *Mendenhall*, 446 U.S. at 553-54, 100 S. Ct. at 1877); *Schmerber v. California*, 384 U.S. 757, 767, 86 S. Ct. 1826, 1834 (1966).

[government] restraint or interference" except under "clear and unquestionable authority of law." *Terry*, 392 U.S. at 9, 88 S. Ct. at 1873 (citation omitted). "Unquestionably," people are "entitled to the protection" from unreasonable government searches and seizures as they traverse "down the street." *Terry*, 392 U.S. at 9, 88 S. Ct. at 1873.

¶18 As a function of the procedural warrant and probable cause requirements of the Fourth Amendment and Mont. Const. art. II, § 11,[11] warrantless government searches and seizures are per se unreasonable except to the extent "conducted in strict accordance with" a recognized narrowly-delineated exception to those express requirements. *State v. Zeimer*, 2022 MT 96, ¶¶ 25-26 and 32, 408 Mont. 433, 510 P.3d 100; *Hoover*, ¶ 14; *State v. Ballinger*, 2016 MT 30, ¶ 16, 382 Mont. 193, 366 P.3d 668; *State v. Hardaway*, 2001 MT 252, ¶ 36, 307 Mont. 139, 36 P.3d 900; *Katz*, 389 U.S. at 357, 88 S. Ct. at 514.[12] The State thus has the burden of affirmatively showing that a challenged warrantless search or seizure was conducted in strict accordance with an applicable recognized exception to the Fourth

---

[11] *See* U.S. Const. amend. IV ("no Warrants" for search or seizure "shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized") and Mont. Const. art. II, § 11 ("[n]o warrant to search any place, or seize any person or thing shall issue . . . without probable cause").

[12] Conversely, government searches and seizures conducted "in accordance with a judicial warrant . . . issued upon a showing of probable cause of illegal activity and particularly describing the person, area, or item to be searched or seized" are "presumptively *reasonable*" as referenced in the Fourth Amendment and Mont. Const. art. II, § 11. *Zeimer*, ¶ 25 (emphasis added). The constitutional presumption is rebuttable, *inter alia*, under the "over-arching" reasonableness requirement of the Fourth Amendment and Mont. Const. art. II, § 11, upon a showing that the manner in which the otherwise permissible search or seizure was conducted was nonetheless unreasonable under the circumstances. *See State v. Peoples*, 2022 MT 4, ¶ 24, 407 Mont. 84, 502 P.3d 129; *Terry*, 392 U.S. at 28, 88 S. Ct. at 1883 ("[t]he manner in which [a] seizure and search were conducted is, of course, as vital a part of the [Fourth Amendment reasonableness] inquiry as whether they were warranted at all").

Amendment and Article II, Section 11, warrant and probable cause requirements. *State v. Noli*, 2023 MT 84, ¶ 29, 412 Mont. 170, 529 P.3d 813 (citing *Zeimer*, ¶¶ 25-26 and 32); *State v. Elison*, 2000 MT 288, ¶¶ 39, 56, and 58, 302 Mont. 228, 14 P.3d 456; *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 2031-32 (1971).[13]

1. Whether Stanley was Constitutionally "Seized."

¶19 As a threshold matter of law, the Fourth Amendment and Mont. Const. art. II, § 11, protection against unreasonable searches and seizures applies only if and when a government "search" or "seizure" actually occurs. *See*, *e.g.*, *Zeimer*, ¶ 24 (*inter alia* citing *Mendenhall*, 446 U.S. at 551-56, 100 S. Ct. at 1875-78);[14] *Strom*, ¶ 10 (citing *Mendenhall*);

---

[13] Stanley cursorily asserts that Mont. Const. art. II, § 10 (protection of "individual privacy" from government intrusion absent "showing of a compelling state interest"), somehow affords him even greater or enhanced protection under the circumstances at issue from warrantless investigative stops than the more specific search and seizure protection provided by the Fourth Amendment and Mont. Const. art. II, § 11. When personal privacy is more broadly implicated in a particular case, we have recognized that Mont. Const. art. II, § 10, may provide somewhat "broader" privacy protection than the "traditional[]" protection of privacy in a person's home and things provided under U.S. Const. amend. IV, and Mont. Const. art. II, § 11. *See*, *e.g.*, *Noli*, ¶ 28; *Peoples*, ¶ 13 ("threshold privacy test" under Article II, § 10, and "search" test under Fourth Amendment and Article II, § 11, are same but in application we have recognized "broader range of reasonable expectations of privacy under Article II, § 10 in certain regards" resulting in "correspondingly narrower range" of recognized "exceptions" to the Article II, § 11, warrant requirement than recognized under Fourth Amendment warrant requirement); *State v. Nelson*, 283 Mont. 231, 241-43, 941 P.2d 441, 448-49 (1997) (noting Article II, § 10, protection of "informational privacy" and "autonomy privacy" in the making of "intimate personal decisions" and the "conduct[] [of] personal activities without" government "observation, intrusion, or interference"—citation omitted); *State v. Goetz*, 2008 MT 296, ¶¶ 13-14, 345 Mont. 421, 191 P.3d 489 (citing *State v. Hardaway*, 2001 MT 252, ¶¶ 32 and 35, 307 Mont. 139, 36 P.3d 900); *State v. Solis*, 214 Mont. 310, 316-20, 693 P.2d 518, 521-23 (1984). Stanley has not demonstrated, however, that Mont. Const. art. II, § 10, is implicated here apart from the Mont. Const. art. II, § 11, protection of his freedom from unreasonable warrantless interference with his physical liberty without probable cause.

[14] In *Zeimer*, ¶ 24, we inaccurately cited *California v. Hodari D.*, 499 U.S. 621, 625-29, 111 S. Ct. 1547, 1550-52 (1991), and *State v. Clayton*, 2002 MT 67, ¶¶ 13-27, 309 Mont. 215, 45 P.3d 30 (citing *Hodari D.*), for the independently correct proposition that the protections of the Fourth

15

*State v. Roberts*, 1999 MT 59, ¶ 16, 293 Mont. 476, 977 P.2d 974 (citing *Mendenhall*, 446 U.S. at 554, 100 S. Ct. at 1877); *State v. Jenkins*, 192 Mont. 539, 543-45, 629 P.2d 761, 764 (1981) (citing *Mendenhall* and *Terry*, 392 U.S. at 21, 88 S. Ct. at 1880); *Mendenhall*, 446 U.S. at 551-54, 100 S. Ct. at 1875-77; *Terry*, 392 U.S. at 16 and 19 n.16, 88 S. Ct. at 1877 and 1879. A person is "seized" for purposes of the Fourth Amendment, and Mont. Const. art. II, § 11, only if "a government officer in some way restrains" or interferes with the person's liberty, however briefly, by use of physical force or assertion or show of authority which under the totality of the circumstances "would cause an objectively reasonable person to feel *not* free to leave." *Hoover*, ¶ 15 (citation omitted—emphasis added); *Mendenhall*, 446 U.S. at 552-54, 100 S. Ct. at 1876-77; *Terry*, 392 U.S. at 16 and 19 n.16, 88 S. Ct. at 1877 and 1879 (person is seized "whenever a police officer accosts" the person "and restrains his [or her] freedom to walk away").[15] Consequently, regardless

Amendment and Mont. Const. art. II, § 11, apply only if and when a government "search" or "seizure" actually occurs. The cited portion of *Hodari D.*, however, more narrowly regarded the Supreme Court's grafting of a subjective element onto the otherwise purely objective Fourth amendment *Mendenhall* standard or test for non-physical police seizures by show of force, i.e., even if an objectively reasonable person would *not* feel free to leave under the circumstances no seizure occurs *unless the subject actually yields*, *capitulates*, *or submits* to that police show of force. *Hodari D.*, 499 U.S. at 626 and 628-29, 111 S. Ct. at 1550-52. *Zeimer* thus overlooked that we had previously rejected that aspect of *Hodari D.* without analysis as inconsistent with the "broader protection" against unreasonable searches and seizures otherwise similarly provided by Mont. Const. art. II, § 11. *Clayton*, ¶¶ 13-15 and 21-22. *Accord State v. Merrill*, 2004 MT 169, ¶ 11, 322 Mont. 47, 93 P.3d 1227 (noting *Clayton* rejection of that aspect of *Hodari D.* under Mont. Const. art. II, § 11). Without questioning or further endorsing that aspect of *Clayton*, or undermining the independently correct proposition for which they were cited in *Zeimer*, we therefore repudiate our inaccurate citations to *Hodari D.* and *Clayton* (citing *Hodari D.*) in *Zeimer*, ¶ 24.

[15] *See State v. Loh*, 275 Mont. 460, 468, 914 P.2d 592, 597 (1996) (constitutional "seizure" is government action that "deprives [an] individual of dominion over his or her person or property"— quoting *Horton v. California*, 496 U.S. 128, 133, 110 S. Ct. 2301, 2306 (1990)).

of purpose and however brief, police restraint or interference with a person's freedom of movement, whether by force or assertion or show of authority, is a "seizure" as referenced in the Fourth Amendment and Mont. Const. art. II, § 11. *Hoover*, ¶ 15; *State v. Massey*, 2016 MT 316, ¶ 9, 385 Mont. 460, 385 P.3d 544; *State v. Jarman*, 1998 MT 277, ¶ 9, 291 Mont. 391, 967 P.2d 1099; *State v. Martinez*, 2003 MT 65, ¶ 20, 314 Mont. 434, 67 P.3d 207; *State v. Reynolds*, 272 Mont. 46, 49, 899 P.2d 540, 542 (1995); *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 694-95 (1981); *Terry*, 392 U.S. at 16-17, 88 S. Ct. at 1877.

¶20    Implicit, a fortiori, in the threshold *Mendenhall*/*Terry* standard for determining when a constitutional "seizure" of a person occurs is that not every police-citizen encounter or interaction necessarily is or results in a constitutional "seizure." *See Wilkins*, ¶¶ 8 and 10-11 (quoting *Terry*, 392 U.S. at 19 n.16, 88 S. Ct. at 1879); *State v. Merrill*, 2004 MT 169, ¶ 17, 322 Mont. 47, 93 P.3d 1227 ("no precept of law prevents an officer from engaging a citizen" in a "voluntary conversation[]"); *State v. Wagner*, 2003 MT 120, ¶ 19, 315 Mont. 498, 68 P.3d 840 (citing *Mendenhall*, 446 U.S. at 552, 100 S. Ct. at 1876); *State v. Lovegren*, 2002 MT 153, ¶¶ 13-17 and 25, 310 Mont. 358, 51 P.3d 471 (applying *Terry* standards in community caretaker context); *Mendenhall*, 446 U.S. at 552, 100 S. Ct. at 1876 (citing *Terry*, 392 U.S. at 19 n.16, 88 S. Ct. at 1879). A constitutional "seizure" of a person occurs only when police "in some way restrain" the person's "liberty," i.e., freedom of movement, whether "by means of physical force or show of authority." *Terry*, 392 U.S. at 17-19 n.16, 88 S. Ct. at 1878-79; *see also*, *e.g.*, *Mendenhall*, 446 U.S. at 551-56, 100 S. Ct. at 1875-78 (citing *Terry*, 392 U.S. at 19 n.16, 88 S. Ct. at 1879). Within that

framework, the analytical line between police-citizen encounters or interactions that are or become constitutional "seizures," and those that are merely coincidental or consensual, is whether or at what point under the totality of the circumstances the subject police conduct and posture would have caused an objectively "reasonable person" to feel not free to ignore or refuse to answer or otherwise cooperate with the police, disengage from any further interaction with the police, and move away from the police presence. *Mendenhall*, 446 U.S. at 551-55, 100 S. Ct. at 1875-77 (citations omitted); *Terry*, 392 U.S. at 19 n.16, 88 S. Ct. at 1879. *Accord State v. Clayton*, 2002 MT 67, ¶¶ 12 and 21-23, 309 Mont. 215, 45 P.3d 30 (reaffirming application of *Mendenhall* objective reasonable-belief-not-free-to-leave test for warrantless "seizure" of person without probable cause for arrest under Fourth Amendment and Mont. Const. art. II, § 11—citations omitted); *Roberts*, ¶ 16 (recognizing and applying *Mendenhall* reasonable-belief-not-free-to-leave test for constitutional "seizure" of person); *Florida v. Bostik*, 501 U.S. 429, 434-35, 111 S. Ct. 2382, 2386 (1991) (police "may generally" approach a person and "ask questions," request identification, or ask for consent to search his or her person or belongings "as long as" they "do not convey" that compliance "is required" by or under penalty of law); *Florida v. Rodriguez*, 469 U.S. 1, 5-6, 105 S. Ct. 308, 311 (1984) ("initial" encounter where officers "simply asked if [the person] would step aside and talk with them" was "clearly the sort of consensual encounter that implicates no Fourth Amendment interest"—citing *Mendenhall*, *supra*, and *Florida v. Royer*, 460 U.S. 491, 497, 103 S. Ct. 1319, 1324 (1983)); *Immigration & Nat. Serv. v. Delgado*, 466 U.S. 210, 215-17, 104 S. Ct. 1758, 1762-63 (1984) (police approach, questioning, and request for identification does not necessarily effect a seizure per se but

18

particularized suspicion of criminal activity is required "if the person refuses to answer" and police then "take additional steps" to delay or interfere with the person by continuing to press for an answer—citing *Terry*, 392 U.S. at 19 n.16, 88 S. Ct. at 1879, and *Mendenhall*, 446 U.S. at 554, 100 S. Ct. at 1877); *Royer*, 460 U.S. at 497-98, 103 S. Ct. at 1324 (no constitutional seizure where police "merely approach[]" a person "on the street or in another public place" and "ask him if he is willing to [voluntarily] answer some questions" as long as the person is free to "not answer any" particular question, generally decline, and to "go on his way").[16]

¶21    It thus follows that an initially coincidental or consensual police-citizen encounter may eventually ripen into a constitutional seizure at the point under the totality of the circumstances when the subject police conduct and posture would have caused an objectively "reasonable person" to feel not free to ignore or refuse to answer or otherwise cooperate with the police, disengage from any further interaction with the police, and move away from the police presence.  *See Clayton*, ¶¶ 21-22; *Bostik*, 501 U.S. at 434-35, 111 S. Ct. at 2386; *Mendenhall*, 446 U.S. at 551-55, 100 S. Ct. at 1875-77; *Rodriguez*, 469 U.S. at 5-6, 105 S. Ct. at 311; *Delgado*, 466 U.S. at 216, 104 S. Ct. at 1762-63; *Terry*, 392 U.S.

---

[16] In *Delgado*, the Supreme Court illustratively contrasted the non-seizure police-citizen interaction initially permissible in *Royer*, 460 U.S. at 493-95, 497-98, and 501-02, 103 S. Ct. at 1321-22, 1324, and 1326 (no constitutional seizure where detectives merely approached suspected drug courier on Miami airport concourse, identified themselves as police, permissively asked if he "had a 'moment' to speak with them," and then permissively asked if they could see his airline ticket and identification), from the warrantless investigative stop at issue in *Brown v. Texas*, 443 U.S. 47, 51-52, 99 S. Ct. 2637, 2641 (1979) (unlawful police "seizure" occurred where police approached and detained "suspicious" man in city alley without particularized suspicion of criminal activity and then continued to press him for identification after he refused to self-identify). *Delgado*, 466 U.S. at 216, 104 S. Ct. at 1762.

at 19 n.16, 88 S. Ct. at 1879. Whether a particular police-citizen encounter or interaction constituted or effected a "seizure" of a person as referenced in the Fourth Amendment and Mont. Const. art. II, § 11, is a mixed question of law and fact ultimately subject to de novo review, but with any predicate lower court findings of historical fact subject to deferential review only for clear error. *See United States v. Ramirez*, 976 F.3d 946, 951 (9th Cir. 2020) (citing *United States v. Washington*, 490 F.3d 765, 769 (9th Cir. 2007)); *United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997); *see similarly Zeimer*, ¶ 32 (re similar standard of review for whether requisite particularized suspicion existed for investigative *Terry* stops—citing *State v. Kaufman*, 2002 MT 294, ¶¶ 10-12, 313 Mont. 1, 59 P.3d 1166; *Ornelas v. United States*, 517 U.S. 690, 694-99, 116 S. Ct. 1657, 1660-63 (1996)).[17]

¶22    In response to Stanley's appeal, the State still asserts that he was free, at least initially, to ignore the police who suddenly appeared around him, refuse to talk with or answer Officer Ahmann, disengage from Ahmann and Officer Peterson, and then continue on his way. The State acknowledges, however, that the encounter eventually evolved into an effective seizure of Stanley, but not until well-down the timeline when Officer Ahmann reached down and grabbed his bicycle after Stanley illegally gave him a false name. We disagree. We agree, rather, with the District Court that Officers Ahmann and Peterson

---

[17] *See similarly*, *United States v. Rabbia*, 699 F.3d 85, 91 (1st Cir. 2012); *People v. Zamudio*, 181 P.3d 105, 119 (Cal. 2008) (citing *Thompson v. Keohane*, 516 U.S. 99, 102, 116 S. Ct. 457, 460 (1995) (whether person is "in custody" for Fifth Amendment purposes is a mixed question of law and fact subject to de novo review)); *State v. Harrington*, 222 P.3d 92, 94-95 (Wash. 2009).

20

effectively seized Stanley in tandem under the totality of the circumstances based on their earlier conduct and show of force at the corner of North 11th Avenue and Patrick Street.

¶23 In broad daylight, Stanley was walking alone down a city sidewalk in an undeveloped open area with no other people around. Two uniformed police officers suddenly appeared unexpectedly out of the blue in marked patrol cars, yelled somebody else's name at him, and then immediately surrounded him for questioning as he reached and was then standing on the sidewalk at the corner at the end of the isolated intersection. Upon being surrounded on both sides by uniformed police officers on the corner sidewalk, an angled-in patrol car facing him at close distance at the corner curb, and with his back to a semi-landscaped grassy area with scrubby bushes and trees, Stanley was immediately peppered with police questions regarding his wig, related association with a third party, and identity. The police did not approach or begin questioning Stanley in a permissive manner. Nor did they casually approach, greet him, and then politely ask whether they could talk to him, ask him some questions, or whether he was willing to speak with them or answer any questions. We hold that the District Court correctly found and concluded, albeit implicitly, that Stanley was effectively seized by police at the corner of North 11th Avenue and Patrick Street because a reasonable person would not have felt free to ignore them or disengage and move-on under the totality of the circumstances created by the police.

    2. Investigative *Terry* Stop Exception to Warrant and Probable Cause Requirements of the Fourth Amendment and Mont. Const. art. II, § 11.

21

¶24 A reasonably brief warrantless investigative stop, or *Terry* stop, is a recognized exception to the warrant and probable cause requirements of the Fourth Amendment and Mont. Const. art. II, § 11, on particularized suspicion of criminal activity. *Hoover*, ¶ 17 (citations omitted); *State v. Gopher*, 193 Mont. 189, 192-94, 631 P.2d 293, 295-96 (1981) (recognizing and applying temporary investigative stop exception as enunciated in *Terry* and further developed in *Cortez*); *Cortez*, 449 U.S. at 417-18 and 421-22, 101 S. Ct. at 694-95 and 697; *Terry*, 392 U.S. at 8-9 and 15-27, 88 S. Ct. at 1873 and 1876-83.[18] Under this narrowly-delineated exception, a police officer "may stop and temporarily detain a person for investigative purposes without" a warrant, or "probable cause for an arrest if, based on specific and articulable [objective] facts known to the officer," including reasonable resulting inferences, he or she has an objectively reasonable suspicion that the particular subject is or is about to be involved in criminal activity. *Hoover*, ¶ 17 (citations and original emphasis omitted); *Gopher*, 193 Mont. at 192-94, 631 P.2d at 295-96 (citations omitted); *Cortez*, 449 U.S. at 417-18 and 421-22, 101 S. Ct. at 694-95 and 697; *Terry*, 392 U.S. at 16-19, 88 S. Ct. at 1877-79.[19] Upon a lawful investigative stop, the officer may

---

[18] *See also State v. Farabee*, 2000 MT 265, ¶ 14, 302 Mont. 29, 22 P.3d 175 (applying *Terry* stop exception with express reference to Mont. Const. art. II, § 11).

[19] The warrantless investigative stop standards developed in *Terry*, *Cortez*, and progeny similarly authorize warrantless police seizures of persons, without probable cause for arrest, to investigate and render aid in their non-prosecutorial public safety/community caretaker role upon reasonable particularized suspicion, based on specific and articulable objective facts, that a citizen is in immediate need of assistance or in peril. *See State v. Smith*, 2004 MT 234, ¶¶ 13-14, 322 Mont. 466, 97 P.3d 567 (citing *State v. Nelson*, 2004 MT 13, ¶ 6, 319 Mont. 250, 84 P.3d 25, and *Lovegren*, ¶ 25). *Accord State v. Cleveland*, 2024 MT 214, ¶¶ 16-19, 418 Mont. 147, 556 P.3d 945 (citing *Zeimer*, ¶¶ 26-27, 33, and 45; *City of Missoula v. Metz*, 2019 MT 264, ¶¶ 16 and 20, 397 Mont. 467, 451 P.3d 530; and *Lovegren*, ¶ 25).

then conduct a reasonably brief investigation corresponding to the particularized suspicion that justified the stop, which may include, *inter alia*, asking the subject for identification and to explain his or her presence and conduct regarding those "suspicious circumstances." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82, 95 S. Ct. 2574, 2580 (1975). *Accord Elison*, ¶ 32 ("stop and inquiry must be reasonably related in scope to the justification for their initiation"—punctuation and citation omitted); *Berkemer v. McCarty*, 468 U.S. 420, 439-40, 104 S. Ct. 3138, 3150 (1984) (police may ask "moderate number of questions to determine . . . identity and to try to obtain information confirming or dispelling" predicate particularized suspicion that justified the stop); *Adams v. Williams*, 407 U.S. 143, 145-46, 92 S. Ct. 1921, 1923 (1972) (*Terry* allows "momentar[y]" determination of "identity" and acquisition of other reasonably related "information" to aid in quick confirmation or dispelling of the justification for the stop). Particularized suspicion of criminal activity sufficient to justify an investigative *Terry* stop may include, *inter alia*, particularized suspicion that the subject "is wanted for past criminal conduct," *Cortez*, 449 U.S. at 417 n.2, 101 S. Ct. at 695, or "*has been* engaged in" immediately recent criminal activity or was a "witness thereto." *Gopher*, 193 Mont. at 192-94, 631 P.2d at 295-96 (emphasis added).[20]

---

[20] We held in *Gopher* that a police response to an apparent pawn shop burglary scene evidenced by an after-hours broken window and resulting silent alarm, observation of a slow-moving vehicle driving by with multiple occupants exhibiting an "inordinate amount of interest in the scene," and experience-based police inference that burglars often return to the scene of a broken building window to see if it is safe to enter and proceed with the intended theft was sufficient for an objectively reasonable particularized suspicion of criminal activity justifying a warrantless stop of the vehicle at another location for questioning of the occupants regarding their knowledge or involvement in the apparent attempted burglary. *Gopher*, 193 Mont. at 190-94, 631 P.2d at 294-96.

¶25 The *Terry* "particularized suspicion standard does not require that an officer be certain, or even ultimately correct," that the subject is or is about to be involved in criminal activity. *Hoover*, ¶ 18 (citations omitted). Nor does it depend on "hard certainties"—only whether the officer "could reasonably surmise," based on objective data and "commonsense conclusions" and inferences from the perspective of "those versed in the field of law enforcement," that the person is or is about to be involved in criminal activity. *Cortez*, 449 U.S. at 418 and 421-22, 101 S. Ct. at 695 and 697. *Accord Gopher*, 193 Mont. at 192-93, 631 P.2d at 295 (quoting *Cortez*).[21] Relevant considerations may include, *inter alia*, the "quantity, substance, quality, and degree of reliability of information known to the officer" at the time. *Hoover*, ¶ 17 (citing *State v. Pratt*, 286 Mont. 156, 161, 951 P.2d 37, 40 (1997), and *Alabama v. White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 2416 (1990)). *Accord Zeimer*, ¶ 28. When the asserted particularized suspicion of criminal activity is based on an informant "tip," the relevant evaluative considerations under the *Terry* stop analysis must more particularly include consideration of the reliability of the tip based on: (1) whether the informant self-identified or was otherwise known to police, and was thus exposed to criminal and civil liability for false-reporting; (2) the extent to which the tip was based on the informant's personal observations; and (3) the extent to which the tip was independently corroborated by police observations or other facts independently known to

---

[21] "[A]ny specialized law enforcement . . . inference[] drawn from the articulated objective facts must . . . still be *objectively reasonable* under the totality of the circumstances." *Noli*, ¶¶ 31 and 62 (citing *Hoover*, ¶ 17; *Gopher*, 193 Mont. at 192 and 194, 631 P.2d at 295-96; and *Cortez*, 449 U.S. at 418 and 421-22, 101 S. Ct. at 695 and 697).

the police.  *See Pratt*, 286 Mont. at 165, 951 P.2d at 42-43; *see similarly State v. Martinez*, 2003 MT 65, ¶ 37, 314 Mont. 434, 67 P.3d 207 (recognizing three-factor "*Pratt* test" as a "narrowly drawn variant" of the *Terry* reasonable particularized suspicion standard applicable when the asserted particularized police suspicion is based on an informant tip).[22] Neither all or any single *Pratt* test factor is necessarily required in a particular case, only that any asserted particularized suspicion of criminal activity based on a third-party tip, rather than police observation or knowledge, is objectively reasonable under the totality of the circumstances.  *See Pratt*, 286 Mont. at 165, 951 P.2d at 42-43; *Gopher*, 193 Mont. at 192-94, 631 P.2d at 295-96 (citations omitted); *Cortez*, 449 U.S. at 417-18 and 421-22, 101 S. Ct. at 694-95 and 697; *Terry*, 392 U.S. at 16-19, 88 S. Ct. at 1877-79.  In any event, the *Terry* particularized suspicion standard ultimately requires more than "mere generalized suspicion," an "undeveloped hunch," or a "good faith belief" that the person is or is about to be engaged in criminal activity.  *Zeimer*, ¶ 28; *Hoover*, ¶ 18; *Illinois v. Wardlow*, 528

---

[22] We later anomalously stated that the so-called *Pratt* test is narrowly limited in application to informant tips relied on by police as a basis for *Terry* investigative traffic stops "*where the circumstances parallel a DUI stop.*"  *State v. Dupree*, 2015 MT 103, ¶¶ 11-12, 378 Mont. 499, 346 P.3d 1114 (emphasis added).  However, while the stop at issue in *Pratt* was in fact a DUI-related traffic stop, a close reading manifests that the distinguishing circumstantial factor triggering application of the *Pratt* test was that the particularized suspicion asserted as justification for the investigative stop was an informant tip, rather than police observation.  *See Pratt*, 286 Mont. at 165, 951 P.2d at 42-43.  Contrary to our statements in *Dupree*, ¶¶ 11-13 and 17, we thus prospectively clarify that the so-called *Pratt* test is not narrowly limited to circumstances that "parallel a DUI stop," but rather, is narrowly limited in the *Terry* stop context to cases where the asserted particularized police suspicion is based on an informant tip rather than first-hand police observation or knowledge.

U.S. 119, 123-24, 120 S. Ct. 673, 676 (2000); *Terry*, 392 U.S. at 22 and 27, 88 S. Ct. at 1880 and 1883.[23]

¶26    Even upon sufficient particularized suspicion of criminal activity, the investigative stop exception authorizes only a reasonably brief and minimally intrusive interference with the individual liberty and privacy of the subject, corresponding to the particularized suspicion that justified the stop. *United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 1575 (1985); *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325-26; *Terry*, 392 U.S. at 18-20, 88 S. Ct. at 1878-79. Upon lawfully stopping a person without a warrant or probable cause, police must therefore act with reasonable diligence to quickly confirm or dispel the underlying particularized suspicion that justified the initial stop. *Zeimer*, ¶ 29 (citing *Sharpe*, 470 U.S. at 686, 105 S. Ct. at 1575 (whether police unreasonably continued or expanded duration of initially lawful investigative stop depends on whether he or she "diligently pursued a means of investigation . . . likely to confirm or dispel" the particularized suspicion that justified the stop)); *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325-26 (duration and scope of an investigative stop must be carefully limited to its "underlying justification" and the "investigative detention must be temporary and last no longer than is necessary to effectuate th[at] purpose"); *Terry*, 392 U.S. at 18-20, 88 S. Ct. at 1878-79 (seizure of a person that "is reasonable at its inception" may become

---

[23] *See similarly Michigan v. Summers*, 452 U.S. 692, 697, 101 S. Ct. 2587, 2591 (1981) (Framers' "[h]ostility to seizures based on mere suspicion was a prime motivation for . . . Fourth Amendment"—interpretive "decisions immediately after its adoption affirmed that common rumor or report, suspicion, or even strong reason to suspect was not adequate" for government seizure of a person—punctuation and citation omitted).

unconstitutional due to unreasonable "intensity and scope"—scope and duration must therefore be "strictly tied to and justified by" the lawful purpose of the stop and thus "reasonably related" thereto—citation omitted). *See similarly Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 837 (2005). The *Terry* stop standard of constitutional reasonableness thus affords police reasonable "latitude," within the reasonable duration and scope of a valid investigative stop, to reach, follow-up on, and confirm or dispel the particularized suspicion of criminal activity that justified the stop. *Zeimer*, ¶ 29 (citing *State v. Sharp*, 217 Mont. 40, 47, 702 P.2d 959, 963 (1985), and *State v. Seaman*, 2005 MT 307, ¶ 29, 329 Mont. 429, 124 P.3d 1137 (citing *Sharp* in community caretaker context)); *Delgado*, 466 U.S. at 226, 104 S. Ct. at 1768 (Brennan, J., concurring and dissenting). However, the constitutional justification and "authority for" a warrantless investigative *Terry* stop without probable cause "ends when tasks" reasonably related to the purpose that justified the stop are "*or reasonably should have been* completed." *Rodriguez v. United States*, 575 U.S. 348, 354, 135 S. Ct. 1609, 1614 (2015) (emphasis added).

¶27 Within that analytical framework, routine requests for identity or proof of identity are generally reasonably related to the purpose of an otherwise lawful investigative stop. *See Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 185-89, 124 S. Ct. 2451, 2458-60 (2004) ("request for identity has an immediate relation to the purpose, rationale, and practical demands of" a typical temporary investigative stop and is a "commonsense inquiry" that is generally reasonably related to the compelling investigative purpose of quickly confirming or dispelling the particular suspicion that justified the stop). *Accord Noli*, ¶ 34 (citing *Hiibel*, *inter alia*); *City of Missoula v. Kroschel*, 2018 MT 142, ¶ 15, 391 Mont. 457, 419

27

P.3d 1208 (citing *Hiibel*, *inter alia*); *Berkemer*, 468 U.S. at 439-40, 104 S. Ct. at 3150 (police may ask a "moderate number of questions to determine [the subject's] identity and to try to obtain information confirming or dispelling" predicate particularized suspicion that justified the stop); *Adams*, 407 U.S. at 145-46, 92 S. Ct. at 1923 (*Terry* allows request for "identity" to aid in confirmation or dispelling of the justification for the stop).[24]  Police "may also attempt to [quickly] verify information provided by the subject, and ask for other related information, as long as the additional inquiry is both reasonably related in scope to the particularized suspicion . . . that justified the stop," and "does not unreasonably prolong its duration under the totality of the circumstances." *Noli*, ¶ 34 (citing *Royer* and *Michigan v. Summers*, 452 U.S. 692, 700 n.12, 101 S. Ct. 2587, 2593 (1981) (discussing various "investigative techniques" permissible upon lawful *Terry* stop, *inter alia* including requests for identification, and that Fourth Amendment "reasonableness" requires "balancing of competing interests" in individual liberty and privacy with compelling government interest in effective law enforcement—citation omitted)); *see also*, *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325-26; *Terry*, 392 U.S. at 18-20, 88 S. Ct. at 1878-79.  *Accord Zeimer*, ¶ 29 (similar citations omitted).   "[R]outine police database checks" for "outstanding wants/warrants," *inter alia*, are similarly permissible upon a lawful investigative stop "as long as conducted in a reasonably quick and diligent manner." *Noli*, ¶ 34 (citing *Rodriguez*,

---

[24] *See similarly Hayes v. Florida*, 470 U.S. 811, 816, 105 S. Ct. 1643, 1647 (1985); *United States v. Hensley*, 469 U.S. 221, 229, 105 S. Ct. 675, 680 (1985).

575 U.S. at 350 and 354-57, 135 S. Ct. at 1612 and 1614-16).[25]  State statutes which thus require disclosure of a suspect's identity "in the course of a valid *Terry* stop" are generally "consistent with" the Fourth Amendment and Mont. Const. art. II, § 11, protection "against unreasonable searches and seizures."  *See Hiibel*, 542 U.S. at 188, 124 S. Ct. at 2459; *accord Kroschel*, ¶¶ 14-15 (citing *Hiibel*).[26]

¶28    The Legislature has thus authorized police, upon a lawful investigative stop, to "request the person's name[,] present address[,] and an explanation of [his or her] actions" regarding the particularized suspicion of criminal activity that justified the stop. Section 46-5-401(1)-(2), MCA (1991-2019).  While § 46-5-401(1)-(2), MCA, does not expressly authorize police to request information other than a person's name, current address, and "an explanation" of the person's conduct, nothing in its language or legislative

---

[25] Nor is "incidental police questioning" regarding other unrelated criminal activity per se unreasonable, as long as it does not unreasonably "infringe or intrude upon the privacy or security of the subject, or prolong the duration of the stop to any measurable degree, beyond that reasonably necessary to quickly accomplish or complete the justified purpose of the stop with reasonable diligence."  *Noli*, ¶ 36 (citing *Zeimer*, ¶ 45; *Rodriguez*, 575 U.S. at 350 and 354-57, 135 S. Ct. at 1612 and 1614-16; *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 788 (2009); *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325-26; *Terry*, 392 U.S. at 18-20, 88 S. Ct. at 1878-79—original emphasis omitted).

[26] To the extent independently provided by state law, the "threat of criminal sanction" for failure to respond to a police request for identification on a lawful investigative stop "helps ensure that the request . . . does not become a legal nullity."  *Hiibel*, 542 U.S. at 188, 124 S. Ct. at 2459.  While statutes authorizing police requests for identification on a lawful investigative stop, and requiring subject compliance therewith, do not violate the Fourth Amendment protection against unreasonable searches and seizures, nor does the Fourth Amendment require compliance therewith.  *See Hiibel*, 542 U.S. at 188-89, 124 S. Ct. at 2459-60.  *Accord Berkemer*, 468 U.S. at 439-40, 104 S. Ct. at 3150 (police may ask a "moderate number of questions to determine . . . identity and . . . information confirming or dispelling" predicate particularized suspicion that justified the stop, but Fourth Amendment does not require subjects "to respond").

history indicates any legislative intent to preclude police from asking other questions that are reasonably related to the particularized suspicion that justified the stop. *Kroschel*, ¶ 15. To the contrary, in pertinent essence, § 46-5-401(1)-(2), MCA (1991-2019), is as was intended no more than a codification of the *Terry* investigative stop exception to the warrant and probable cause requirements of the Fourth Amendment and Mont. Const. art. II, § 11. *See State v. Anderson*, 258 Mont. 510, 514-15, 853 P.2d 1245, 1247-48 (1993) (noting 1991 amendment of § 46-5-401, MCA, "to reflect the particularized suspicion standard set forth in [*State v.*] *Gopher*"); *Reynolds*, 272 Mont. at 49, 989 P.2d at 542 (noting 1991 amendment to § 46-5-401, MCA, "to be consistent with United States Supreme Court and Montana case law"); Commission Comments to § 46-5-401(1), MCA (1991) (noting that the 1991 amendments more closely "reflect" our holding in *Gopher*, 193 Mont. at 192-94, 631 P.2d at 295-96 (recognizing temporary investigative stop exception enunciated in *Terry* and further developed in *Cortez*)).[27] *See also State v. Graves*, 191 Mont. 81, 87, 622 P.2d 203, 206-07 (1981) (noting that pre-1991 §§ 46-5-401 and -402, MCA (1979), formerly § 95-719, RCM (1947) (1973), like "similar statutes in other jurisdictions," was "enacted to codify the rule announced in the landmark 'stop and frisk' case of *Terry v. Ohio*"). Section 46-5-403, MCA (1991-2019) (investigative "stop authorized by" § 46-5-401, MCA, "may not last longer than is necessary to effectuate the purpose of the stop"), is similarly an essential codification of the related *Terry* stop scope and duration

---

[27] Comments of Commission on Criminal Procedure §§ 20.01-.03 (Jan. 10, 1989), File No. 88-559, Montana Supreme Court.

limitations recognized in *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325-26; *Terry*, 392 U.S. at 17-20, 88 S. Ct. at 1878-79; and progeny. *See State v. Carlson*, 2000 MT 320, ¶ 21, 302 Mont. 508, 15 P.3d 893 (citing § 46-5-403, MCA, and *Royer*); Commission Comments to § 46-5-403, MCA (1991).[28]

¶29　By implication from the foregoing *Terry* stop standards, police may lawfully expand the duration or scope of an investigative stop beyond its initial purpose upon development of new or broader particularized suspicion of criminal activity based on additional objective factual information observed or acquired during the lawful duration and scope of the initial stop. *State v. Case*, 2007 MT 161, ¶ 34, 338 Mont. 87, 162 P.3d 849; *Carlson*, ¶ 21; *Hulse v. State*, 1998 MT 108, ¶¶ 40-42, 289 Mont. 1, 961 P.2d 75; *Sharp*, 217 Mont. at 46, 702 P.2d at 963. Police may lawfully do so, however, only if the additional objective factual information, and resulting new or broader particularized suspicion of criminal activity, arose or was acquired *before* the initial particularized suspicion and purpose that justified the initial stop was confirmed, dispelled, or otherwise completed or exhausted upon reasonable diligence without unnecessary delay, *or reasonably could have been*. *Hoover*, ¶ 23 (citing *Hulse*, ¶¶ 40-42); *Rodriguez*, 575 U.S. at 354, 135 S. Ct. at 1614. *Accord Noli*, ¶¶ 33, 35, 46-49, 52, and 55-63; *Zeimer*, ¶¶ 30-31, 36-44, and 47-51. However, at the point that the investigating officer has either dispelled the predicate particularized suspicion that justified the initial stop within its lawful scope and duration, failed to develop justification for an arrest based on a warrant or probable cause, or

---

[28] *Id.*

developed new or additional particularized suspicion of criminal activity based on additional specific and articulable factual information observed or acquired during the lawful scope or duration of the initial stop, or the seizure otherwise ends under circumstances which would cause a reasonable person to feel free to disengage with police and move-on, police must disengage and allow the subject(s) to leave or carry-on without further delay. *See Noli*, ¶ 35 (citing *Zeimer*, ¶ 31); *State v. Meza*, 2006 MT 210, ¶ 23, 333 Mont. 305, 143 P.3d 422; *Clayton*, ¶¶ 21-22 (citing *Mendenhall*); *Rodriguez*, 575 U.S. at 354-57, 135 S. Ct. at 1614-16; *Bostik*, 501 U.S. at 434-35, 111 S. Ct. at 2386 (citing *Mendenhall*); *Rodriguez*, 469 U.S. at 5-6, 105 S. Ct. at 311; *Mendenhall*, 446 U.S. at 551-55, 100 S. Ct. at 1875-78; *Delgado*, 466 U.S. at 216, 104 S. Ct. at 1762-63; *Brignoni-Ponce*, 422 U.S. at 881-82, 95 S. Ct. at 2580; *Terry*, 392 U.S. at 19 n.16, 88 S. Ct. at 1879.[29] The same principle applies to the extent that the scope or duration of the initial stop may have been lawfully expanded based on new or additional particularized suspicion of criminal activity developed during the course of the initial stop. *Noli*, ¶ 35 (citing *Zeimer*, ¶ 30 (citing *Hulse*, ¶ 40; *Martinez*, ¶¶ 27-29; *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325-26; and *Terry*, 392 U.S. at 19-20, 88 S. Ct. at 1878-79)).

¶30     On subsequent review, the question of whether police had an objectively reasonable particularized suspicion that a person was engaged in, or about to be engaged in, criminal activity, based on specific and articulable objective facts and reasonable law enforcement inferences, "is first a question of fact under the totality of the circumstances subject to

---

[29] *See also, e.g., Noli*, ¶¶ 33, 35, 46-49, 52, and 55-63; *Zeimer*, ¶¶ 30-31, 36-44, and 47-51.

review only for clear error." *Zeimer*, ¶ 32 (citing *Hoover*, ¶ 17; *Kaufman*, ¶¶ 10-12; *Cortez*, 449 U.S. at 417-18, 101 S. Ct. at 695; *Terry*, 392 U.S. at 21-22, 88 S. Ct. at 1880). "However, any related conclusion or application of law, such as whether the involved or indicated activity was unlawful in nature or whether the asserted particularized suspicion was objectively reasonable is a question of law subject to de novo review." *Zeimer*, ¶ 32 (citing *Kaufman*, ¶¶ 10-11; *Ornelas*, 517 U.S. at 694-99, 116 S. Ct. at 1660-63 (assessment of asserted "reasonable [particularized] suspicion and probable cause" involve mixed questions of fact and law subject to de novo review except that "findings of historical fact" are subject to review "only for clear error")).

3. Whether the Arrest of Stanley that Led to Police Discovery of the Subject Drug Evidence was the Result of an Unlawful Investigative *Terry* Stop.

¶31 Based on the facts specified in the anonymous tip,[30] and independent police knowledge of the pendency of an active arrest warrant and prior familiarity with Sobrepena, it is beyond genuine material dispute that Officers Ahmann and Peterson had a reasonable particularized suspicion that Sobrepena was the subject of an active arrest warrant, had recently been seen or was staying in a particular undeveloped open area in Bozeman, and had been wearing a distinctive bright red curly wig to conceal his identity from police to elude apprehension on the subject warrant while there. It is further beyond

---

[30] Ahmann acknowledged on examination the anonymous nature of the citizen tip and its lack of temporal specificity, facts which obviously alluded and pertained to the first two *Pratt* tip-reliability factors under the *Terry*/*Cortez* reasonable particularized suspicion analysis. However, while the tip was anonymous, and the record does not indicate whether the information was based on the tipster's personal observation, whether Sobrepena was in fact the subject of an active arrest warrant was by nature a fact readily verifiable if not already known to police, and the report of a man wearing a bright red curly wig in the subject area was a fact independently corroborated by Officer Ahmann's subsequent personal observation upon arrival in the area.

33

genuine material dispute that, immediately upon hearing the corresponding police radio advisory and dispatch of other officers (Peterson and Garfield) into the area to locate and apprehend the fugitive Sobrepena, Officer Ahmann quickly spotted an adult male walking a bicycle down the sidewalk in that precise area, wearing an uncommonly distinct bright red, curly-haired wig which closely matched the tipster's description of the similar wig then reportedly being worn by Sobrepena in that area as a means to elude police apprehension on a warrant. It is thus beyond genuine material dispute that Officers Ahmann and Peterson had a reasonable particularized suspicion, based on specific and articulable objective facts, that the man spotted by Ahmann approaching the North 11th Avenue/Patrick Street intersection (i.e., Stanley) was Sobrepena, a wanted fugitive then engaged in an active attempt to elude police apprehension, and thus involved in criminal activity. We hold that Officers Ahmann and Peterson had sufficient particularized suspicion of criminal activity to stop the as-yet unidentified Stanley for the purpose of investigating whether he was in fact the fugitive Sobrepena and, if so, arresting him.

¶32 The fact that Officer Ahmann soon recognized, even before the constitutional seizure that ultimately occurred, that the man was in fact not the fugitive Sobrepena did not completely eliminate the initial particularized suspicion of criminal activity that initially justified the stop. While not Sobrepena, the man stopped (Stanley) was nonetheless wearing an uncommonly distinctive bright red curly-haired wig that precisely matched the wig Sobrepena had reportedly been wearing to elude police apprehension on a warrant in that very same area. As described by Ahmann at hearing, the wig was "very distinct" insofar that it resembled the uncommon hairstyle worn by "the comedian" "Carrot

34

Top" for purely comedic purposes, and was thus "definitely not" a "common hairstyle or hair color" for women or men.  Under the totality of the circumstances, it was objectively reasonable for Ahmann to suspect, as he did, that Stanley had just been with, or was returning to, the fugitive Sobrepena in that same area, and that he personally got the wig from him there and thus knew where Sobrepena could then be immediately located in the very same area where police were then actively searching for him pursuant to the tip.  Ahmann's reasonable particularized suspicion was further supported by the fact, as stated in his post-incident probable cause affidavit, that he also "knew" the then-unidentified Stanley "to be an acquaintance of Sobrepena."  Thus, even after discovering that Stanley was not Sobrepena, Officer Ahmann still had a reasonable particularized suspicion, even if ultimately incorrect, that the as-yet unidentified man was just found in the same specific area, wearing distinctive evidence of the fugitive's immediate presence in that same area— a curly bright red comedic "Carrot Top" wig.  Certainly, Ahmann was aware of no objective circumstantial indicia that Stanley was personally engaged or involved in criminal activity at the particular moment he was walking down Patrick Street.  Nor can it be said, however, that he did *not* have an objectively reasonable particularized suspicion that the man had just left or was returning to where he recently got the almost uniquely distinctive wig from the fugitive Sobrepena, in the precise location where the fugitive had been recently seen wearing it to avoid apprehension on a warrant.  Under the totality of the circumstances, it was thus neither arbitrary, nor objectively unreasonable, for Officer Ahmann and Officer Peterson to continue converging on Stanley at the corner of North 11th Avenue and Patrick Street for the purpose of identifying him and asking where he got

the distinctive wig and, if from Sobrepena, where, when, and whether he knew where the fugitive could then be found. We hold that Officers Ahmann and Peterson lawfully proceeded to stop Stanley and briefly question him regarding those matters, even after recognizing that he was not the wanted fugitive Sobrepena as initially suspected.

¶33 Little more than six minutes had elapsed from the time that Officer Ahmann caught-up with Stanley and began questioning him about his identity, wig, and association with Sobrepena, and the time when police later arrested him on a confirmed DOC want[31] and judicial warrants after he finally gave his true name. While Ahmann challenged the truth of Stanley's assertion that he was "James Biden,"[32] and persisted under the implied threat of arrest for obstructing[33] until he finally gave his true name, there is no objective evidence, or even assertion, that Stanley's true answer was coerced by physical force, threat of physical force, or deception. Under those circumstances, we further hold that Officers Ahmann and Peterson neither unreasonably prolonged or expanded the duration or purpose of their investigative inquiry after lawfully stopping Stanley on the corner of North 11th Avenue and Patrick Street, nor otherwise conducted it in an objectively unreasonable manner.

---

[31] *See* § 46-23-1012, MCA (2019) (warrantless administrative arrests, and judicial arrest warrants, on probation violation).

[32] Coincidentally or not, Joe Biden was a prominent United States Senator who was then running for the office of the President of the United States.

[33] "A person commits the offense of obstructing a peace officer" if the person "knowingly obstructs, impairs, or hinders the enforcement of the criminal law . . . or the performance of a governmental function." Section 45-7-302(1), MCA.

¶34　In the wake of the District Court's preliminary ruling that police discovery of Stanley's wanted/warrant status was the fruit of an unlawful investigative stop, the balance of the litigation below, and the court's ultimate judgment, focused on whether the resulting illegal drug evidence was subject to suppression under the prophylactic jurisprudential exclusionary rule often applicable in such circumstances. However, upon our independent review of the record, we may affirm a lower court judgment on appeal if a correct result was ultimately reached, even if based on an incorrect or different reason. *State v. Marcial*, 2013 MT 242, ¶ 10, 371 Mont. 348, 308 P.3d 69; *State v. Ellison*, 2012 MT 50, ¶ 8, 364 Mont. 276, 272 P.3d 646. Accordingly, for the foregoing reasons, and thus without need to address application of the jurisprudential exclusionary rule, we hold that the District Court ultimately reached the correct result, albeit for a different reason, in denying Stanley's motion to suppress the subject drug evidence.

## CONCLUSION

¶35　We hold that the District Court correctly concluded that police constitutionally seized Stanley when they converged on him on the subject street corner. However, contrary to the court's ruling, we hold that the seizure was lawful under the totality of the circumstances in accordance with the narrowly-delineated investigative *Terry* stop exception to the warrant and probable cause requirements of the Fourth Amendment and Mont. Const. art. II, § 11. We thus hold that the ensuing arrest of Stanley, which in turn resulted in police discovery of the illegal drug evidence at issue, was neither the result of an unlawful investigative stop, nor a subsequent unlawful expansion or extension of that

initial stop.  We therefore hold that the District Court, albeit for a different reason, correctly

denied Stanley's motion to suppress the subject evidence.  AFFIRMED.

/S/ DIRK M. SANDEFUR

We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA