DA 23-0568

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 176

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

JORY JERAE SONGER,

      Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause Nos. ADC-2018-88,
ADC-2022-464, and ADC-2022-476
Honorable Mike Menahan, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Nicholas K. Brooke, Stephens Brooke, P.C., Missoula, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Mardell Ployhar,
Assistant Attorney General, Helena, Montana

          Kevin Downs, Lewis and Clark County Attorney, Helena, Montana

          Submitted on Briefs:  July 23, 2025

                Decided:  August 12, 2025

Filed:

                        _____
                                   Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Jory Jerae Songer (Songer) appeals from judgments entered in three separate proceedings before the First Judicial District Court, which culminated in a combined sentencing hearing wherein sentences were entered in all three proceedings.

¶2 Songer was on probation under prior sentences imposed in 2018 when, during a stop by law enforcement, he fled from the scene on foot and was apprehended. Law enforcement recovered his backpack, which contained a scale, illegal drugs, and a face mask that matched the description of a mask worn by a gunman who had recently shot two individuals. Upon investigation, Songer was charged with two counts of attempted deliberate homicide and two counts of assault with a weapon; and, in a separate proceeding, with criminal possession of dangerous drugs with intent to distribute, criminal possession of drug paraphernalia, and obstructing a peace officer. The State also petitioned to revoke suspension of his 2018 sentences.

¶3 Songer moved for suppression of the evidence discovered in his backpack. The District Court denied the motion and Songer was convicted of the drug charges. A witness testified about Songer's presence at the location of the shooting and provided her statement via recorded deposition. After the District Court granted the State's motion to preserve the witness's testimony by deposition, the deposition was played during Songer's trial for attempted deliberate homicide and assault. Songer was convicted.

¶4 Prior to his trials, Songer became frustrated with his counsel and demanded new representation. After a hearing, the District Court denied Songer's motion to substitute counsel. Songer's suspended sentences were revoked, and he received new revocation

2

sentences thereon. Songer appeals his convictions for the drug charges, attempted deliberate homicide and assault, as well as the revocation of his suspended sentences. He requests reversal of the denial of his request for new counsel.

¶5 We restate the issues on appeal as follows:

1. *Did the District Court err by allowing a witness to testify via video without a demonstration of the witness's unavailability?*

2. *Did the District Court err by denying the motion to suppress evidence discovered in the backpack because the original stop was not supported by particularized suspicion?*

3. *Did the District Court err by denying the motion to substitute counsel?*

¶6 The State concedes reversible error under Issue 1, and we reverse and remand for a new trial thereon. We affirm on Issues 2 and 3.

## FACTUAL AND PROCEDURAL BACKGROUND

¶7 In July of 2022, the Helena Police Department (HPD) received information about a stolen silver BMW that had been involved with drug crimes in the Helena area by way of a "call for service" (CFS). HPD Officer Guerrero testified that he reviewed the CFS report about the stolen BMW "when it came in," and that reviewing CFS reports was part of his routine for preparing to go on patrol.[1]

¶8 Around 1:00 a.m., on August 18, 2022, HPD officers were dispatched to a large housing complex in Helena in response to reports of gunfire. When officers arrived, they found two people who had sustained nonfatal gunshot wounds. The victims reported that

---

[1] Officer Guerrero further testified that he had successfully completed two law enforcement academies—one in Long Beach, California and the other in Montana—as well as drug training at the Northeast Drug Training Center, prior to being employed by HPD as a patrol officer.

they had been outdoors talking when, from the darkness, a person approached them wearing "all black" or "really dark" clothing, with their "hood up, and a mask." The person shot at the group and fled. Security video cameras captured the shooter running for several blocks before getting into the passenger side of a white Hyundai Sonata, which drove away.

¶9 On September 9, 2022, Officer Guerrero was patrolling through a hotel parking lot near the interstate where he had often observed criminal activity and noticed a vehicle that matched the description of the stolen silver BMW identified in the CFS report he had earlier reviewed.[2] The vehicle was backed into a parking spot near the hotel. Officer Guerrero testified that, when he drove by the BMW, all the windows were up but he could see through the windshield and observed three men inside hunched over something. He could not immediately identify two of the men, but that, "I did see a male who was a possible shooter, I believe, who had a warrant for his arrest [named] Shay McPhee."[3] Officer Guerrero testified that the men "froze" when they saw him. He kept driving through the parking lot to see how the vehicle's occupants would react, and when he turned around, the three men exited the vehicle, with McPhee walking away from the car and the two unidentified men standing near the vehicle.[4] Intending to apprehend McPhee first, Officer

---

[2] The silver BMW shared similarities with the stolen BMW but was, in fact, not the vehicle described in the CFS report. The stolen BMW was silver with no front license plate. The silver BMW Guerrero observed had a front license plate.

[3] McPhee's arrest was sought for allegedly being involved in a shooting in Gallatin County, not the shooting at issue in this case.

[4] The State admitted Officer Guerrero's bodycam video into evidence, which began recording when Officer Guerrero exited his cruiser. Songer's counsel moved to admit the police cruiser's dashcam footage into evidence, which started about the same time as the bodycam, and it was admitted.

Guerrero told the other two men to "stop right there" and to "hang out" by the car. One of the men asked Officer Guerrero, "what's going on?", and Officer Guerrero responded: "you'll find out in a minute." Other officers arrived and stood near the two men while Officer Guerrero took McPhee into custody, advising McPhee that there was a warrant for his arrest. Officer Guerrero observed McPhee appearing to put something into the open bed of a nearby parked pickup truck, and Guerrero recovered drug paraphernalia there. Returning to the two unidentified men, Guerrero asked them for identification, and both men resisted providing their names. Officer Guerrero eventually identified them as Tyler Blackwell (Blackwell) and Appellant Songer. Songer had been previously convicted of accountability to burglary, obstructing a peace officer, and tampering with evidence. He had served time in prison and was, at the time, on probation.

¶10 Looking inside the BMW, Officer Guerrero saw a new roll of tin foil and individual tin foil squares in the seats, which he testified was commonly used to consume fentanyl, as well as a "meth kit." Blackwell was picking at his skin, slurring his speech, and fidgeting. Songer asked Officer Guerrero if he was "technically being detained" and Officer Guerrero responded, "yes . . . I think you guys were smoking dope in there, so I'm still investigating, so you're still being detained." Officer Guerrero testified that Songer repeatedly touched and repositioned a backpack and, when he asked Songer who the backpack belonged to, Songer initially denied owning the backpack before ultimately stating that it was his. Officer Guerrero placed the backpack on top of his police cruiser, and Songer, after slightly moving away from the officers, fled on foot. Officer Guerrero gave chase and apprehended Songer after locating him hiding under an apartment stairwell. Songer's backpack was

5

later searched pursuant to an authorized probationary search. The backpack contained Songer's cell phone, methamphetamine, another white substance that looked like, but was not, methamphetamine,[5] two used syringes, ten unused syringes, foil with a dark residue, a scale, and a mask. Data later retrieved from Songer's cell phone included text messages showing that he appeared to be engaging in illegal drug transactions. Songer was charged with criminal possession of dangerous drugs with intent to distribute, criminal possession of drug paraphernalia, and obstructing a peace officer. The mask, black with a white skull, was similar to witness descriptions of the mask worn by the shooter on August 18. Songer, therefore, became the primary suspect in the shooting of the two people near the housing complex.

¶11 Law enforcement had been conducting a separate investigation into the white Hyundai Sonata that video footage had showed the shooter entering, learning it was also stolen, and leading officers to question a woman named Patience Davis (Davis). Over the course of two interviews, Davis admitted to stealing the Hyundai Sonata, transporting Songer and dropping him off at the housing complex at about 1:00 a.m. on August 18, and picking him up again minutes later. Although she denied knowing anything about the shooting, Davis was arrested and charged with two counts of accountability to attempted deliberate homicide. Officers interviewed Songer about the shooting, but he gave obtuse and contradictory answers to questions, eventually saying the shooting "wasn't a planned hit, I wasn't there though." Songer was charged with two counts of attempted deliberate

---

[5] Officer Guerrero testified that the white substance was likely a cutting agent commonly mixed with methamphetamine.

homicide and two counts of assault with a weapon. The State also petitioned for revocation of Songer's 2018 suspended sentences for which he was on probation.[6]

¶12 Songer moved the District Court to suppress the evidence gathered from his backpack, which related to both the drug charges and the attempted deliberate homicide charges. The District Court held a suppression hearing on February 9, 2023, in which Officer Guerrero testified that the particular hotel parking lot in which he encountered Songer, McPhee, and Blackwell was located near the interstate and "usually [has] some type of criminal activity, be it stolen vehicles, people with warrants, drug activity" that he had often observed. He further testified that he thought the silver BMW appeared to be the stolen vehicle that was previously involved in drug activity in the area, based upon "previous knowledge from the call for service that I had," and that he was able to identify McPhee by looking through the vehicle's front windshield as he drove by, although he could not see the other two men clearly. However, all three men were hunched over together, and when they saw him drive by, they froze. Officer Guerrero continued driving by to see how they would react and, as he was turning his patrol car around, all three exited the vehicle, and Guerrero then initiated contact with them. After the hearing, the District Court denied Songer's motion, stating:

> [T]he facts demonstrate objective data upon which Officer Guerrero's observations establish the three men in the BMW . . . had committed an offense—criminal possession of dangerous drugs. On patrol of the parking

---

[6] Songer's prior sentences for accountability to burglary, obstruction, and tampering with evidence were entered in Cause No. ADC-2018-88 ("suspended sentence"). The charges for possessing and dealing drugs were filed herein under Cause No. ADC-2022-464 ("drug charges"), and the attempted deliberate homicide and assault with a weapon charges were filed herein under Cause No. ADC-2022-476 ("attempted deliberate homicide charges").

lot in an area known for drug activity and crime, Officer Guerrero saw three men who were hunched over something in a vehicle. It appeared they were smoking drugs. This circumstance created a particularized suspicion the occupants of the vehicle were committing an offense. Thus, Officer Guerrero had valid reason to conduct a stop and give rise to his subsequent investigation. . . . Upon establishing particularized suspicion to justify the traffic stop, Officer Guerrero detained Blackwell and Songer.

¶13 The jury trials for Songer's drug charges and attempted deliberate homicide charges were separately set to begin in March 2023. During the February 22, 2023 final pretrial conference for the attempted deliberate homicide case, Songer's counsel, Steven Scott (Scott), requested the scheduling of a change of plea hearing with the intention of resolving all of Songer's pending charges via a plea agreement. However, at the change of plea hearing, Songer refused to enter a plea, and the District Court set a new date for the attempted deliberate homicide trial. In response, Songer said he had not waived his right to a speedy trial and objected to changing the trial date, but the original date for the attempted deliberate homicide trial had already been vacated due to his request for a change of plea hearing.

¶14 On March 10, 2023, Scott filed a request for a *Gallagher* hearing to determine whether Songer was entitled to new counsel,[7] stating Songer "wants a new attorney assigned to his case [because] there is a breakdown in the attorney-client relationship." The District Court held the hearing on March 15, 2023. Scott represented that Songer was not willing to meet with him or his investigator, Bill Emerson (Emerson), and that Songer had filed a request for a different attorney with the Office of the State Public Defender

---

[7] *State v. Gallagher*, 2001 MT 39, ¶ 7, 304 Mont. 215, 19 P.3d 817.

(OPD), which had denied his request. Scott stated: "when the client refuses to meet with a member of his defense team . . . [and] refuses to convey information to me about the case, basically doesn't trust me, I think that that relationship has been severed." Songer's "refusal to engage with me," Scott said, "basically goes to the very essence of a breakdown in the attorney-client relationship." The District Court inquired of Songer why he needed new counsel, and Songer replied: "I just feel like I won't get a fair trial, and I want new counsel that I feel comfortable with." When the District Court further pressed him on the issue, Songer explained he was unaware his trial date would be vacated and that he thought evidence on his cell phone could help his case. In response, Scott explained that the defense had possession of Songer's cell phone data, and that Emerson had reached out to every person Songer had asked to be contacted. The District Court denied Songer's motion to substitute counsel, telling Songer that he had "a competent attorney who has spent months delving into this case," and that "your dispute with your attorney has to do with trial tactics, and what your defense will be at trial. That's not a reason that I would remove an attorney from representing you." Songer then filed a motion to *continue* the attempted deliberate homicide trial to allow private defense counsel, Nicholas Brooke (Brooke), to represent him. The District Court also denied this motion.

¶15 Songer's trial on the drug charges was held March 27, 2023, and the jury convicted him on all counts. Before trial on the attempted deliberate homicide charges, the State filed a motion for an order directing the deposition of Davis be taken to preserve her testimony for trial. The State's motion stated it was concerned that Davis would be unavailable for trial because: 1) she was being threatened by other inmates for testifying against Songer;

9

and 2) Davis had been accepted into an intensive outpatient program in Billings for her methamphetamine addiction, which program was scheduled to begin during the allotted trial dates. Songer, through Scott, opposed the motion, stating: "Bed dates can be moved. Mr. Songer is facing two life sentences if convicted at trial . . . . Ms. Davis needs to appear before the Court and face Mr. Songer as is Mr. Songer's right under the Confrontation Clause." However, the District Court granted the State's motion. In Davis's video deposition, Davis testified that she knew Songer "[b]efore he went to prison" in 2018. The District Court instructed the State that all references to Songer's prior sentence would need to be redacted from the recording for use at trial.

¶16 Songer's attempted deliberate homicide and assault trial commenced on May 1, 2023. In the presence of the jury, the State played Davis's video deposition. The version of the recording played did not have Davis's reference to Songer being in prison redacted. Scott immediately objected, arguing the State had violated the District Court's instruction to redact the reference, and that the inclusion was grounds for mistrial. The District Court declined to declare a mistrial, reasoning that:

> [F]or many people who have no contact with the criminal justice system, the use of the words 'prison' and 'jail' are interchangeable. They don't know the difference between the Lewis & Clark County Detention Center as a place that people are detained pretrial, or the Montana State Prison, which is a post-disposition facility. And so while that is prejudicial, I'm not sure it warrants a mistrial, because I think jurors could assume here that by 'prison,' Ms. Davis may be referring to the fact that Mr. Songer got arrested for this offense, because of the time that this deposition was taken. And so, I think for that reason, I'm not going to grant a mistrial.

The jury convicted Songer on all counts of attempted deliberate homicide and assault with a weapon.

10

¶17 Songer's sentencing on his pending matters—drug charge convictions, attempted deliberate homicide and assault convictions, and the revocation of his prior suspended sentences—was consolidated into a single hearing held on July 19, 2023. Songer refused to be present in the courtroom, so sentencing was conducted at the county jail. For the drug charges, the District Court sentenced Songer to 20 years in Montana State Prison (MSP) on count I, and six months in county jail for counts II and III. For the attempted deliberate homicide and assault charges, the District Court sentenced Songer to 100 years in MSP for count I, 100 years for count II, 20 years for count III, and 20 years for count IV. The District Court took judicial notice of Songer's new convictions to revoke his suspended sentences, imposing 3 years' commitment to the Montana Department of Corrections. The District Court ordered all of Songer's sentences were to run concurrently. The District Court reasoned that Songer "poses a substantial risk to any community in which he resides should he be released."

¶18 Thereafter, Songer retained Brooke as his attorney. He appeals.

## STANDARDS OF REVIEW

¶19 This Court reviews a district court's evidentiary rulings, revocation of a suspended sentence, and denial of a mistrial, for abuse of discretion. *State v. Smith*, 2020 MT 304, ¶ 12, 402 Mont. 206, 476 P.3d 1178; *State v. Charles*, 2025 MT 58, ¶ 10, 421 Mont. 210, 565 P.3d 1191 (citing *State v. Jardee*, 2020 MT 81, ¶ 5, 399 Mont. 459, 461 P.3d 108). Similarly, "[a] request to substitute counsel is within the sound discretion of the district court," so we review the grant or denial of such a motion for abuse of discretion. *State v. Johnson*, 2019 MT 34, ¶ 13, 394 Mont. 245, 435 P.3d 64. An abuse of discretion occurs

11

when the district court "'acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice.'" *State v. Ament*, 2025 MT 97, ¶ 7, 421 Mont. 502, 568 P.3d 535 (quoting *State v. Passmore*, 2010 MT 34, ¶ 51, 355 Mont. 187, 225 P.3d 1229).

¶20   "A district court's finding that particularized suspicion exists is a question of fact," which this Court reviews for clear error. *State v. Wilson*, 2018 MT 268, ¶ 21, 393 Mont. 238, 430 P.3d 77. A finding of fact is clearly erroneous "if it is not supported by substantial credible evidence, if the court misapprehended the effect of the evidence, or our review of the record convinces us that the court made a mistake." *State v. Gysler*, 2025 MT 106, ¶ 11, 422 Mont. 45, 569 P.3d 167 (quotation omitted).

## DISCUSSION

¶21   *1. Did the District Court err by allowing a witness to testify via video without a demonstration of the witness's unavailability?*

¶22   Songer challenges the District Court's granting of the State's motion to present Davis's testimony by video. The Sixth Amendment of the U.S. Constitution and Article II, Section 24, of the Montana Constitution provide defendants with the right to confront witnesses against them. U.S. Const. amend. VI; Mont. Const. art. II, § 24. This typically requires witnesses testify in court. *State v. Norquay*, 2011 MT 34, ¶ 20, 359 Mont. 257, 248 P.3d 817 (citing *State v. Hart*, 2009 MT 268, ¶ 23, 352 Mont. 92, 214 P.3d 1273). There are limited circumstances in which a district court may allow recorded witness testimony, including when the witness is deemed unavailable for trial. *Norquay*, ¶ 20 (citing *Hart*, ¶ 23); M. R. Evid. 804. A witness may be deemed unavailable to testify by

12

order of the court on the ground of privilege or if the witness is "unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity." M. R. Evid. 804(a)(1), 804(a)(4). "The proponent of the testimony of an unavailable witness in a criminal case bears the burden of demonstrating that it made a 'good faith effort' to secure the witness's attendance at trial." *Norquay*, ¶ 21 (quoting *Hart*, ¶ 24).

¶23 The State concedes that it did not make a showing of Davis's unavailability for trial. The State explains:

> In the State's motion for a deposition, the State explained that it was concerned that Davis might be unavailable for trial because she had received threats in jail and she was scheduled to begin treatment a week before the trial. . . . The State did not provide additional information on the record, however, indicating that Davis was further impacted by threats or entered treatment and was actually unavailable when the trial began. Even if it was appropriate to order the deposition to preserve Davis's testimony for trial . . . the deposition should not have been played at trial without a showing that Davis was unavailable at trial. . . . Given the significance of Davis's testimony, the State . . . concedes that Songer is entitled to reversal of his [attempted deliberate homicide and assault with a weapon] convictions.

¶24 Songer acknowledges the State's concession and disagrees only regarding the impact this outcome will have upon the sentences for his other offenses and upon any future sentencing proceeding, an issue we address below. We conclude here the District Court abused its discretion by granting the video deposition motion, and accordingly reverse for a new trial on the attempted deliberate homicide and assault with a weapon charges.[8]

---

[8] Songer also argues that reversal of the District Court's denial of his motion for mistrial, based upon the playing of the unredacted portion of the video deposition, is required. However, having reversed his conviction on the basis explained herein, we do not reach that issue.

13

¶25   2.  *Did the District Court err by denying the motion to suppress evidence discovered in the backpack because the original stop was not supported by particularized suspicion?*

¶26   Songer argues that Officer Guerrero's original stop and seizure of Songer were "based on the conduct of virtually any law-abiding citizen" and therefore were "based on speculation" rather than objective indicators.

¶27   The Fourth Amendment of the U.S. Constitution and Article II, Section 11, of the Montana Constitution prohibit searches and seizures by law enforcement without a warrant "issued upon a showing of probable cause" and "particularly describing the person, area, or item to be searched or seized." *State v. Roberts*, 2025 MT 110, ¶ 14, 422 Mont. 109, 569 P.3d 524 (citing *State v. Loberg*, 2024 MT 188, ¶ 10, 418 Mont. 38, 554 P.3d 698); U.S. Const. amend. IV; Mont. Const. art. II, § 11.  "'A reasonably brief warrantless investigative stop, or *Terry* stop, is a recognized exception to the warrant and probable cause requirements of the Fourth Amendment and Mont. Const. art. II, § 11, on particularized suspicion of criminal activity.'"  *Roberts*, ¶ 15 (quoting *State v. Stanley*, 2024 MT 271, ¶ 24, 419 Mont. 61, 558 P.3d 1147); *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968).  To have particularized suspicion, an officer need not be certain or correct that the person is or is about to be engaged in a crime. *Roberts*, ¶ 15 (citing *Stanley*, ¶ 25). However, if an officer's only basis for suspecting criminal activity could be "drawn from the conduct of virtually any law-abiding person," the suspicion is not particularized. *Loberg*, ¶ 12; *see also State v. Noli*, 2023 MT 84, ¶ 32, 412 Mont. 170, 529 P.3d 813 ("'[w]hen the only bas[es] for suspecting a specific person of wrongdoing [are] inferences that could be drawn from the conduct of virtually any law-abiding person, the resulting

14

suspicion cannot, by definition, be particularized,' but rather is more akin to mere generalized suspicion or an 'inarticulable hunch[]' of criminal activity") (citing *State v. Reeves*, 2019 MT 151, ¶ 13, 396 Mont. 230, 444 P.3d 394). Particularized suspicion depends on the totality of the circumstances. *Roberts*, ¶ 15 (citing § 46-5-401, MCA). During an investigative stop, officers may request identification and "'an explanation of the person's actions' regarding the particularized suspicion that justified the stop." *Noli*, ¶ 34 (citing § 46-5-401(1)-(2), MCA). An investigative stop may broaden in scope if, during the stop, an officer gains "additional objective data of wrongdoing," giving rise "to further suspicions." *State v. Bailey*, 2021 MT 157, ¶ 21, 404 Mont. 384, 489 P.3d 889 (quoting *State v. Hurlbert*, 2009 MT 221, ¶ 21, 351 Mont. 316, 211 P.3d 869).

¶28 The evidence Songer challenges was found during a probationary search of Songer's backpack after the initial stop was expanded based upon further developments, including Blackwell's fidgeting and picking his skin, McPhee's walking away and Guerrero's recovery of drug paraphernalia McPhee dumped into the bed of a parked truck, and Songer's initial resistance to identifying himself and his denial of his ownership of the backpack, followed by him moving away from officers and fleeing the scene. Songer does not challenge either the *expansion* of the initial stop and seizure, or the procedure and authority for the probationary search of the backpack, but rather bases his challenge entirely on his contention that the initial stop itself and simultaneous seizure were invalid as lacking particularized suspicion.

¶29 Officer Guerrero had knowledge from a CFS he had earlier reviewed that a silver BMW had been reported as stolen and was connected to involvement with drug activity in

15

the Helena area. While patrolling in a hotel parking lot that was located near the interstate and "usually had some type of criminal activity, be it stolen vehicles, people with warrants, drug activity" that Guerrero had often observed, he spotted a vehicle that appeared to match the description of the stolen BMW, backed into a parking spot. Guerrero drove past the front of the vehicle and could see into the car through the windshield, observing three individuals hunched over something together. Guerrero testified that when the men saw him, they "froze." Guerrero recognized McPhee and knew that a warrant had been issued for his arrest. To test what the men would do next, Guerrero continued driving, but then turned around in the parking lot, at which point the three men exited the vehicle. Believing the men were using drugs—which Guerrero indicated to Songer when Songer asked if he was being detained—Guerrero initiated the stop by telling Songer and Blackwell to "stop right there" and "hang out" by the car, as he pursued McPhee.

¶30     We disagree with Songer's argument that the stop and seizure was based upon mere speculation, and conclude the District Court did not err in finding particularized suspicion of illegal drug activity existed, based upon the totality of these circumstances as supported by substantial evidence, to initiate Songer's stop and seizure. Further, at a minimum, Guerrero could have followed up his knowledge that McPhee had an active warrant, which would have likewise brought him to the vehicle, where the drug evidence was in plain view. We affirm the District Court's denial of Songer's motion to suppress.

¶31     *3. Did the District Court err by denying the motion to substitute counsel?*

¶32     Songer argues the District Court erred by denying his motion to substitute counsel because "Songer and Scott agreed that their relationship was irreparable, and Songer

16

requested to relieve Scott multiple times. This breakdown cast a shadow over the entire defense and create[d] a presumption of prejudice." The State answers that the District Court gave Songer an opportunity to explain his complaints about counsel during the hearing, but that Songer failed to articulate any facts at that time which would entitle him to a change in counsel, expressing only a preference for different counsel.

¶33 Criminal defendants have a fundamental right to effective assistance of counsel, but not to the counsel of their choice. *State v. Aguado*, 2017 MT 54, ¶ 23, 387 Mont. 1, 390 P.3d 628. A defendant "is entitled to substitute counsel if he presents material facts showing good cause for the substitution as demonstrated by: (1) an actual conflict of interest; (2) an irreconcilable conflict between counsel and the defendant; or (3) a complete breakdown in communication between counsel and the defendant." *Johnson*, ¶ 19. However, "[a] defendant may not demand substitute counsel simply because he lacks confidence in, or does not approve of, his counsel." *Johnson*, ¶ 14. A district court must assess whether a defendant's complaints about his counsel are seemingly substantial and, if so, hold a hearing to address the validity of the complaints and weigh them against counsel's specific explanations. *Johnson*, ¶¶ 21-22 (citations omitted). District courts must analyze, case-by-case, whether the breakdown of the attorney-client relationship has become so great "that the principal purpose of the appointment—to provide the defendant with the effective assistance of counsel—is frustrated." *Johnson*, ¶ 18.

¶34 In *Johnson*, we held that the district court did not abuse its discretion when it denied Johnson's motion for substitution of counsel, in which Johnson stated counsel did not file certain pretrial motions, did not interview key witnesses, and visited Johnson "less than

17

two times." *Johnson*, ¶ 29. His counsel explained that he was unwilling to file frivolous motions, had spoken to the two witnesses Johnson provided, and that Johnson had "cut their second meeting short." *Johnson*, ¶¶ 25, 31.

¶35 At the hearing on Songer's motion to substitute counsel, Songer stated that he had not waived his right to a speedy trial, and that the vacating of the first trial date for the attempted deliberate homicide charges frustrated his defense. He claimed he wanted to subpoena witnesses and that Scott had ignored information on Songer's cell phone that could have proven helpful to his case. Scott explained that he had objected to the rescheduling of the trial on Songer's behalf, that the defense was in possession of Songer's cell phone data, and that he and his investigator, Emerson, had interviewed every person Songer requested they contact. Scott advised the District Court that Songer would refuse to meet with him and Emerson, and offered, "I think that that relationship has been severed" due to Songer's "refusal to engage." When the District Court pressed Songer about the conflict with Scott, Songer stated he wanted "a fair trial" and "new counsel that I feel comfortable with."

¶36 Songer's complaints do not demonstrate that the relationship between himself and Scott "had deteriorated to the point where the conflict or breakdown in communication prevented the mounting of an adequate defense." *Johnson*, ¶ 30. As the District Court reasoned, the choice to subpoena witnesses is a trial tactic, and disagreements regarding an attorney's trial strategy are best addressed in a postconviction proceeding. *Johnson*, ¶ 16. Scott remained willing to meet with Songer and to continue to advocate, and had done extensive work for Songer. It was Songer who refused to meet with Scott and Emerson.

18

We conclude the District Court did not err by determining Songer had failed to establish good cause justifying substitution of counsel. *Johnson*, ¶ 20.

¶37 The Concurrence references one of the statements made by the District Court during the *Gallagher* hearing on March 15, 2023, that Songer's argument for new counsel "would essentially allow every criminal defendant on the eve of trial to refuse to speak to their attorneys," and thus necessitate vacating the trial. Concurrence, ¶ 42. Songer does not reference this statement in his briefing or base his argument thereon, but the point is well taken that the disposition of the motion must be based upon the governing standards, not upon an assumption that the timing of the motion would indicate a mischievous intent. A defendant may indeed intend to create mischief, but, on the other hand, may be correctly reporting that a complete breakdown in communication has occurred at that point, and, therefore, the motion needs to be determined by proper inquiry and application of the test as stated in *Johnson*. Here, the entirety of the District Court's comments demonstrate that it properly inquired of Songer's basis for his request, and its denial of the motion was not an abuse of discretion for the reasons stated herein.

¶38 Songer briefly offers that this Court should reverse his convictions based upon the cumulative effect of all errors raised in his appellate briefing. However, we have reversed his convictions of attempted deliberate homicide and assault with a weapon, and the cumulative error doctrine does not apply here. *See State v. Severson*, 2024 MT 76, ¶ 45, 416 Mont. 201, 546 P.3d 765 (the doctrine applies "in the rare case in which several errors occur, the cumulative effect of which is to deny the defendant the right to a fair trial").

19

¶39 Finally, the State argues that Songer's convictions for his drug offenses in ADC-2022-464, and the revocation of his suspended sentences in ADC-2018-88, should be affirmed outright, ostensibly with the sentences imposed herein by the District Court in those respective proceedings. Songer argues otherwise, noting that he received the maximum sentence for his drug convictions and that, "[w]ithout a homicide conviction, [it] is likely that a court would impose a substantially lesser sentence. . . . If this court finds no error in those two convictions and reverses only the attempted homicide case, new sentencing is warranted for all three." While sentencing Songer in the joint sentencing hearing, the District Court took judicial notice of Songer's guilty verdicts "in the other two matters" to find Songer had violated a condition of his sentencing order.

¶40 In *Bauer v. State*, 1999 MT 185, 295 Mont. 306, 983 P.2d 955, this Court held a criminal defendant was entitled to resentencing "as a matter of fundamental fairness" when the district court appeared to rely on later-vacated convictions in sentencing the defendant. *See Bauer*, ¶¶ 28, 30 ("[w]hen Bauer's prior . . . convictions were vacated subsequent to the imposition of his [other] sentences, however, what was correct information at the time of sentencing became misinformation after the fact"). Similarly, here, the District Court clearly relied on Songer's convictions for the attempted deliberate homicide and assault in rendering its sentencing decisions. In light of our reversal on Issue 1, we conclude that a new sentencing is warranted in all three matters.

¶41 Accordingly, we reverse and remand for a new trial on Songer's attempted deliberate homicide and assault charges. Any sentencing therein will, of course, be dependent upon the outcome of that proceeding. We affirm the District Court's denial of

20

Songer's motions to suppress evidence and to substitute counsel. We remand for new sentencing on Songer's drug convictions in ADC-2022-464, and for new revocation sentencing on Songer's prior offenses in ADC-2018-88.

/S/ JIM RICE

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER

Justice Laurie McKinnon, specially concurring.

¶42 I agree with the Court's resolution of issues one and two. Regarding Songer's motion to substitute counsel, issue three, the Court does not adequately address the record that was made at the *Gallagher* Hearing or the District Court's reasoning. While ultimately I would affirm the court's denial of Songer's substitution request based on the standard of review, the facts and circumstances of this case, together with the representations made by Scott, require a more substantive analysis under *Johnson* of whether Songer should have been appointed substitute counsel. Additionally, the District Court's stated reason for denying the request was that "it would essentially allow every criminal defendant on the eve of trial to refuse to speak to their attorneys, and thus necessitat[e] . . . vacating . . . trial, and appointing new counsel." However, an inability to communicate with counsel is precisely the inquiry *Johnson* demands and the fact that defendants in criminal trials can posture in this manner, even every time, is not a basis itself for denying the substitution

21

request. Nonetheless, because the reasons Songer gave did not support a breakdown of communication, I would affirm the District Court's denial of his substitution request. I turn now to the record.

¶43 On March 10, 2023, Scott filed a request for a *Gallagher* hearing representing that there was a breakdown in the attorney-client relationship. During the *Gallagher* hearing held on March 15, Scott began by informing the court that Songer had refused to meet Bill Emerson (Emerson), Scott's investigator, when Emerson tried to meet with him on March 9. Emerson had been working on the case since the beginning and he and Scott had met with Songer on numerous occasions. Emerson went to meet Songer because Deputy County Attorney Mary Barry had emailed Scott indicating that Songer had reached out to detention staff asking for an interview with the lead Detective in his homicide case. Songer had never consulted with Scott or Emerson about wanting to talk to the detective. When Emerson arrived at the jail, after waiting for some time, he was informed by staff that Songer refused to meet with him. The next day, Songer filed a complaint with the Office of Public Defender complaining about Scott and asking for new counsel. Scott's supervisor sent a letter to Songer indicating his request was denied. Songer then called Scott on March 13 and left a message indicating he had information about his case, but he did not feel comfortable sharing the information with Scott. And on March 14, Songer left a message with Scott asking if he had been assigned a new attorney.

¶44 Scott related to the court, based on these events, that "there's no trust here anymore between himself or I, or basically between him towards me. He doesn't trust me." Scott further explained:

22

And so I think that what we have here, Judge, is we do have a total breakdown of the attorney/client relationship at this point. I consider that when the client refuses to meet with a member of his defense team, whether it's Bill Emerson or myself, and then Mr. Songer refuses to convey information to me about his case, basically doesn't trust me, I think that relationship has been severed.

I don't believe that it can be salvaged. His refusal to engage with me basically goes to the very essence of a breakdown in the attorney-client relationship. Mr. Songer is looking at 261 years in prison if convicted on all counts, plus whatever additional time on the [Petition to Revoke] cases out there.

At this point, I think it would be in Mr. Songer's best interests that he be assigned new Counsel in this matter. I just don't think it's a good idea for the two of us to proceed forward at this time. Frankly[,] I don't think that would be good.

The court responded that under Scott's analysis, it would put the defendants in charge of picking their own attorney because a criminal defendant could refuse to meet their attorney and claim a breakdown in communication.

¶45 Based on this record and defense counsel's representation, it is difficult to arrive at any other conclusion but that there had been a complete breakdown in communication between Scott and Songer. Here, Scott's representations to the court concerning Songer's conduct towards his defense team and Scott's opinion that their attorney-client relationship had been severed were the proper focus of the inquiry. Scott represented there was no trust, that the relationship could not be salvaged, and that Songer's refusal to engage went to the very essence of his 6th Amendment right to counsel, noting that Songer was facing a lengthy term of imprisonment. These representations were made, not by a defendant, but by defense counsel knowledgeable in the law and capable of assessing and gauging the dynamics of his relationship with his client. In *Johnson*, we clarified that requests for substitute counsel are not to be handled as a mini post-conviction proceeding conducted

23

during the pendency of a criminal trial. *Johnson*, ¶¶ 16, 19. The focus of the inquiry is whether "the defendant presented material facts showing good cause for his substitution request as demonstrated by: (1) an actual conflict of interest; (2) an irreconcilable conflict between counsel and the defendant; or (3) a complete breakdown in communication between counsel and the defendant." *Johnson*, ¶ 20. In *Johnson*, once defense counsel acknowledged that his communication with Johnson had completely broken down, the trial court provided Johnson with substitute counsel. *Johnson*, ¶ 30. Were it not for the standard of review—abuse of discretion—I would likewise conclude that defense counsel's representations established good cause for substitution of counsel based on a complete breakdown in communication.

¶46    However, the inquiry continued. After Scott represented that the attorney-client relationship had been completely severed, the District Court inquired of Songer his reasons for requesting new counsel. Songer replied that Scott refused to follow through with investigation and trial preparation requests he made, all of which related to trial strategy and defense tactics. Importantly, Songer did not provide any material facts relating to a complete breakdown in his communication with Scott, other than his refusal to talk to Scott. "Disagreement between counsel and defendant over matters such as defense tactics and trial strategy—issues potentially relevant to an ineffective assistance of counsel claim—could certainly lead to an irreconcilable conflict or complete breakdown in communication, justifying substitute counsel." *Johnson*, ¶ 20. But a defendant is entitled to substitute counsel only if he presents material facts showing good cause for the substitution as demonstrated by a complete breakdown in communication between counsel

24

and defendant. *Johnson*, ¶ 31. The District Court's further inquiry demonstrated that the complete breakdown articulated by Scott was caused by Songer's unilateral refusal to communicate—a refusal premised upon his objection to Scott's trial strategy and a basis upon which a substitution request should be denied. I dispute the District Court's conclusion that Songer's substitution request should be denied because it would allow a defendant in every case to refuse to talk to counsel and thus necessitate vacating a trial. At its purest form, a refusal to talk epitomizes a complete breakdown in communication and should, at least, be a significant factor to consider in conjunction with all the circumstances of the attorney-client relationship. The inquiry must be guided by whether there has been a breakdown in communication, not whether a defendant could delay a trial through his unilateral action.

¶47 Although the record supports that there was a complete breakdown in communication and good cause to grant the substitution request, such a request is within the sound discretion of the district court. *Johnson*, ¶ 13. A district court abuses this discretion if it acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *Johnson*, ¶ 13. Here, the record demonstrates the complete breakdown in communication was due entirely to Songer's refusal to communicate because he did not like Scott's choice of trial strategy. Arguably, a reasonable basis exists to conclude that a refusal premised on nothing else but an objection to trial strategy, a matter committed to post-conviction relief, did not establish good cause to substitute counsel. Although we recognized in *Johnson* that disagreements about such matters as defense tactics and trial strategy could lead to a complete breakdown

25

in communication justifying substitute counsel, *Johnson*, ¶ 20, Songer did not provide any *other* material facts to substantiate why he could not proceed with Scott as his counsel *except* that he disagreed with his trial strategy.

¶48 I think the record does support substitution of counsel based on Scott's representations and Songer's refusal to communicate, but the matter is committed to a district court's discretion. Songer did not provide any additional facts, other than his objection to trial strategy, to support his request for substitute counsel. Accordingly, under the standard of review, I would affirm the District Court's order denying Songer's request for substitution of counsel. To the extent the Court affirms under a different rationale, as I believe it does, I specially concur.


/S/ LAURIE McKINNON


Justices Ingrid Gustafson and Katherine Bidegaray join in the specially concurring Opinion of Justice Laurie McKinnon.


/S/ INGRID GUSTAFSON
/S/ KATHERINE M BIDEGARAY